H. M. HARRINGTON, Jr., et al., Appellants,

v.

TEXACO, INC., Appellee.

No. 21148.

United States Court of Appeals Fifth Circuit.

Dec. 4, 1964.

Rehearing Denied Feb. 9, 1965.

H. M. Harrington, Jr., Roberts & Smith, Harrington & Harrington, Longview, Tex., for appellants.

Lawrence Jack Moore, Houston, Tex., Jack W. Flock, Ramey, Brelsford, Hull & Flock, Tyler, Tex., for appellee.

Before RIVES and BROWN, Circuit Judges, and GARZA, District Judge.

JOHN R. BROWN, Circuit Judge:

This slant hole oil well case presents the questions whether the technical evidence was sufficiently trustworthy to establish the deviation, whether an operator has a joint liability with other co-owners, whether allowance is to be made to the convertor for the cost of production, and whether proper credit was given for amounts received in settlement from other alleged convertors. We reject each of the complaints and affirm.

On special interrogatories, F.R.Civ.P. 49, the jury found the well to have been deviated and bottomed under the adjoining Texaco lease. On the verdict the Court entered judgment for the stipulated value of the oil and gas extracted during the two-year period preceding the commencement of this action.[1]

The slanted well was drilled in 1952 on a twenty-acre tract. The mineral fee owner, Texas Pacific Coal and Oil Company, retaining a ¼ royalty interest, had leased the working interest to Harrington (¼), Allgood (⅛), Lutes (¼), Baton (⅟₁₆), and Godfrey (⅟₁₆). In the beginning Baton, operating under the trade name of "HAL Company,"[2] was the operator of the well, and as such filed the required forms [3] and complied with the regulations of the Railroad Commission of Texas. Since July 30, 1953, Harrington has been designated as the operator. It is stipulated that from the time the well was completed until it was shut-in during July of 1962, $670,000 worth of oil and gas was produced from the well. During the two-year period, the royalty and lease owners received from pipeline purchasers a total of $95,546.92. Texaco, asserting that all of the oil and gas was taken from beneath its lease, claimed ⅞ of the amount paid ($83,603.56). Under an agreed court order, Sperry-Sun Well Surveying Company with the assistance of McCullough Tool Company conducted a directional-deviational survey which revealed that defendants' well was slanted approximately 1600 feet to bottom under the Texaco tract. Over defendants' objection, the survey report was admitted into evidence. Judgment was entered for Texaco for full recovery of the market value of the oil produced less certain credits [4] for the principal sum of $67,-

---

1. It is stipulated that damages would be limited to this two-year period. This was undoubtedly influenced by our decision in Pan American Petroleum Corp. v. Orr, 5 Cir., 1963, 319 F.2d 612, announced after the filing of this suit.

2. The name "HAL" was apparently derived from the first letter of the names of Harrington, Allgood, and Lutes.

3. See Vernon's Tex.Civ.Stat.Ann. art. 6035 (1962); Railroad Commission Rule 1.

4. The credits allowed were:

| | | |
|---|---|---|
| (a) Amount of loss | | $83,603.56 |
| LESS: | | |
| (b) Received in settlement from defendants Baton (1/16) and Godfrey (1/16) | $12,034.40 | |
| (c) 1/5 of amount ($20,109.50) received by Texaco from Texas Pacific Coal and Oil Company in settlement | 4,020.00 | 16,054.40 |
| Amount of Judgment | | $67,549.16 |

549.16 adjudged specifically against the several defendants.[5]

As their principal attack on the merits, the defendants complain of the admission of the Sperry-Sun well survey report on the ground that a proper predicate was not laid, relying on Wigmore's statement of the back-up information which must be adduced in order to prove up the results of a scientific instrument.

"A. The type of apparatus purporting to be constructed on scientific principles must be accepted as dependable for the proposed purpose by the profession concerned in that branch of science or its related art. * * *

"B. The particular apparatus used by the witness must be one constructed according to an accepted type and must be in good condition for accurate work. * * *

"C. The witness using the apparatus as the source of his testimony must be one qualified for its use by training and experience." [6]

■ The structure of the objection is then built on the dual assertion that (a) Texas has recognized this principle,[7] and (b) the Texas law of exclusion is controlling. Analysis shows that the principle (a) is satisfied and, of course, as to (b) it is now clear that F.R.Civ.P. 43 (a) is to be applied to favor the receipt, not the exclusion, of evidence. Monarch Ins. Co. of Ohio v. Spach, 5 Cir., 1960, 281 F.2d 401; Dallas County v. Commercial Union Assur. Co., Ltd., 5 Cir., 1961, 286 F.2d 388.

■■ The requirements of the rule may be established by expert opinion as was unquestionably done here. The qualification of plaintiff's witnesses Gurasich and Sellers as experts amply appears from the record. Both were graduate engineers employed for a number of years by Sperry-Sun, and both were directly concerned with oil well surveys. Gurasich was the Senior Survey Engineer in charge of surveying practices and had been involved for a number of years in testing and improvement of well survey techniques. His testimony demonstrated the reliability and acceptance of the gyroscopic principles involved in the well survey unit here utilized. Sellers, the Sperry-Sun operator who conducted the survey on defendants' well, testified as to the good working condition of the particular apparatus used and the correctness of the particular test conducted. This was corroborated by the testimony of Davis, the McCullough Tool Company employee of seven years, who made the measured depth determination by use of a "wire line" device.

The defendants argue that the well survey report and all exhibits gleaned therefrom should be rejected because the particular apparatus had been introduced only a few months before its use here. But this is only partially true. The unit used here had an outside diameter of 2½ inches as compared with 4½ inches for the gyroscopic mechanism with a reputation for reliability established over a period of several years. This miniaturization, necessary for smaller well bores, carried with it a sizeable reduction in the weight of the "mass" and a tripling of the velocity of the gyro. Because of these differences and its relative newness, the defendants argue that it could

5. With interest at 6% from July 29, 1962, the amounts adjudged were:

|   |   |   |
|---|---|---|
| (a) Lutes (1/4) and Harrington jointly | | $22,154.93 |
| (b) Allgood (1/8) and Harrington jointly | | 11,077.47 |
| (c) Harrington | | 38,369.71 |
| | | $71,602.11 |

6. Wigmore, The Science of Judicial Proof 450.

7. They urge Wilson v. State, 1959, 168 Tex.Cr.R. 439, 328 S.W.2d 311 (results of radar unit for detection of speed).

not have been "accepted," and likewise the operator could not have been "experienced."

■ However, there is adequate testimony to demonstrate that the unit's accuracy was thoroughly tested by Sperry-Sun (whose reputation and good standing in the field was on the line) before introduction for general oil-field use. For like reasons, the defendants' argument that because of the novelty of the unit, Sellers, the operator of the unit, lacked the necessary experience falls short. There is ample evidence to indicate that, even though there were some differences between the 4½ inch gyro and the newer 2½ inch one, they were operated similarly. Thus Seller's skill and experience in operating the larger one carries over to the other. There was ample basis for the Court concluding that the reliability of the device had been adequately established by studies, experiments, and field use.

■ The objection that the survey was inconclusive because the proof of the length of the "hypotenuse" was established only by hearsay is similarly without merit. The reports of the McCullough wire line service were received without objection. On numerous runs into the well, conducted by a qualified operator, a measured depth of 5080 to 5090 feet was established. None of those figures was challenged despite the fact that the survey reports were filed and available for study as the basis of an attack by experts on behalf of the defendants.

We conclude that this directional-deviation survey was properly admitted.

The next attack relates to Harrington alone. He complains of the entry of judgment against him for an amount in excess of that actually received by him. The judgment cast Harrington jointly for amounts received by Allgood and Lutes (see note 5, items (a) and (b)), whereas each of them was held to account only for what each received.[8] The basis for holding Harrington jointly liable with everyone receiving payment for oil taken from Texaco is that he was the designated operator-lessee[9] of the well.

■ As designated operator, under the relevant statutes and Railroad Commission regulations,[10] a number of important obligations rested on him, compliance with which inevitably put the "operator" in operational control of continued production by the well. Thus, Railroad Commission Rule 32 requires the operator to keep regular and complete records of production, sales receipts, business disbursements, etc. He must file the official, periodic production reports with governmental agencies and make reports of work-overs and the like. Generally, he is the man in charge. See Summers, Oil & Gas §§ 651–52 (1962).

■ The fact that no effort was made to establish that Harrington had wilfully deviated the well is not relevant to the joint liability issue since such intent is not required to make out conversion. 14 Tex.Jur. 2d Conversion § 3. It is entirely reasonable to subject a designated operator having such immediate, practical operational command over day-to-day production activities of the well to an accountability for an unlawful conversion of all of the oil. He has in fact the full means of knowledge and the full means, at least initially, of ceasing production if any question exists as to the legality of production. It was thus permissible for Harrington to be held jointly with each of his co-lessees.

8. The practical effect is also to impose a joint liability against Harrington for amounts received as royalties by Texas Pacific to the extent full credit for the settlement amount is not accorded. This aspect is later discussed.

9. The question whether the other owners of the working interest—Allgood and Lutes—should, along with Harrington, be held jointly liable for all oil taken is not before us.

10. Tex.Civ.Stat.Ann. art. 6035 (1962); Railroad Commission Rule 32.

Also involved in the judgment against Harrington (item (c), note 5) is the problem of the extent to which credit should be given for the amount ($20,-109.59) received by Texaco from Texas Pacific in settlement.[11] The Court allowed a credit of $4,020.00 (see item (c), note 4). Harrington urges that full credit should have been accorded.

The law of Texas is clear on the general proposition that a wronged party is entitled to one, and only one, full recovery—that is, full satisfaction of his loss. Consequently, although a single joint tortfeasor may be sued for the total, anything received in settlement from the non-sued tortfeasor must be set off as a credit against the amount recoverable from the other tortfeasors. Riley v. Industrial Finance Service Co., 1957, 157 Tex. 306, 302 S.W.2d 652; Landers v. East Texas Salt Water Disposal Co., 1952, 151 Tex. 251, 248 S.W.2d 731; Bradshaw v. Baylor University, Tex.Com.App. (opinion adopted), 1935, 126 Tex. 99, 84 S.W.2d 703; Hill v. Budget Finance & Thrift Co., Tex.Civ. App., 1964, 383 S.W.2d 79 (1964).

Harrington argues that this case fits neatly within these rules. But this case is different in one very important respect. Although in the case as tried against Harrington, Texaco sought recovery for only the amount of oil taken during the last two years[12] ($83,603.56), its loss, or damage, was the stipulated value of the oil taken over a ten-year period ($586,000). Of that total, about $167,000 was received as royalties by Texas Pacific. On October 23, 1962, about six months before trial and during the time Texaco was still pressing its claim against all for the full ten-year loss, Texaco received $20,109.59 in settlement from Texas Pacific.[13]

Harrington, as a joint tortfeasor seeking to obtain a credit, had the burden of showing that the amount received in settlement from Texas Pacific was allocable to the last two-year period for which he, Harrington, was being sued. There was no proof offered. There was only the stipulation giving the names of the parties who had settled and the amounts. Although the amount of the settlement is singularly close to the amount of royalties received by Texas Pacific during the last two years,[14] there is no evidentiary basis for disturbing the inference drawn by the Trial Judge from the sparce data before him that the amount received in settlement was allocable to the entire loss of Texaco over the ten-year period. The rule requiring credit is to avoid the inequity of a party profiting by his misfortune. With such an objective the rule does not require that the injured party give the benefit of any statute of limitations to the judgment-tortfeasor. The loss against which credit must be given is the loss as sustained in fact, not merely that which can then be legally recovered. Consequently, when the Judge treated this as having been received against the ten-year total claim, it was more than equitable that he gave credit for ⅕ representing two of the ten years.

By their last point, appellants argue that the Court erred in entering judgment for the value of the oil taken without reduction for the "costs of production."

Again, some unique record factors bear some comment. First, the position urged strongly in the trial court in the initial stages, but now practically abandoned, was that Texaco's damages must be limited to the difference in the evaluation of the mineral estate before

---

11. Texas Pacific Coal and Oil Company was not a party to this suit. The defendants originally urged that Texas Pacific was an indispensable party, but this contention was later formally abandoned. No steps were ever taken by the defendants to bring it in as a third party.

12. See note 1, supra.

13. This settlement was part of a larger one between Texaco and Texas Pacific and covered royalties received on two tracts.

14. It was stipulated that Texas Pacific received in this period the sum of $20,-900.89.

and after the trespass and conversion is clearly without merit. The abandonment here involves no real concession. It merely recognizes the Texas law. Under Texas law, these defendants were guilty of conversion of personal property,[15] and under the general rule the measure of damages is the value of the converted property, 14 Tex.Jur.2d Conversion §§ 1, 3, 9, 24—in this case, the value of the oil at the surface. Of course, what the defendants seek is the sweet with the bitter of Texas law. They urge the strong authority that where the wrongful taking is innocently done, one guilty of conversion is entitled to set off the costs of production.[16]

More significant, this contention now asserted was not an issue tried below. The pretrial order defined both the fact issues and the issues of law. Under neither was it even remotely suggested that credit for cost of production was involved.

But treating it as properly preserved below and asserted here, no error is made out. It is clear that the convertor—the party seeking the benefit of the set-off—has the burden of pleading and proving that (a) the conversion was not wilful, and (b) the dollar amount of the claimed costs of production. Right of Way Oil Co. v. Gladys City Oil, Gas &

Mfg. Co., 1913, 106 Tex. 94, 157 S.W. 737, 740, 51 L.R.A.,N.S., 268; 43 Tex. Jur.2d Oil & Gas § 565. This is a sensible rule since the facts necessary to establish good faith and the amount to be set off are peculiarly within the knowledge of the convertor.

As to element (b), it is true that the defendants complain of the exclusion of evidence that at the time the well was being completed Harrington was in a distant city trying a lawsuit. In view of the defendants' pretrial motion to exclude any evidence bearing on defendants' "good faith" since it was no longer pertinent to the period—ten years or two years—for which recovery could be had,[17] we do not think this was erroneous. But in any event, there was no attempt either to prove or proffer evidence on element (b) as to the costs actually incurred in the "innocent" "good faith" production. No one can claim he has been denied a credit for expenses incurred when the nature or dollar costs of such services is nowhere established.

All three appellants contest the Court's taxing as costs any portion of the expense of the Sperry-Sun well survey. Alternatively, they assert that if taxable at all, the expense should be apportioned. As to the alternative contention, they urge that the results of the survey

15. In Texas, oil and gas is regarded as realty when in place but as personalty when severed. W. B. Johnson Drilling Co. v. Lacy, Tex.Civ.App. no writ history, 1960, 336 S.W.2d 230; 14 Tex.Jur. 2d Conversion § 9.

16. Bender v. Brooks, 103 Tex. 329, 336, 127 S.W. 168, 171; Stroud v. Guffey, Tex.Civ.App., 1927, 3 S.W.2d 592, aff'd, Tex.Com.App., 16 S.W.2d 527, 64 A.L.R. 730; Cage Bros. v. Whiteman, Tex.Com. App. (opinion adopted), 1942, 139 Tex. 522, 163 S.W.2d 638, 641–642. Professor Summers, after discussing the history, development and application of the good faith trespasser rule, states: "But in the oil and gas cases the * * * rule has been uniformly applied, by giving as damages the value of the oil and gas in situ, and, if impractical to fix their value in this manner, to give as damages the value of the oil and gas in the tank or

pipe line less the reasonable cost of production. The theory of this rule in its operation is that the trespasser, because of his good faith, has the legal power by his improvement to acquire title by accession. In the taking of oil and gas, the severance and improvement are accomplished by the same physical act. On principle, the measure of damages must be the value of the oil and gas at they existed in the earth. But the value of these substances, in situ, because of their peculiar nature and the uncertainty and difficulty of their production, is hard to prove. The courts have therefore resorted to an easier method of proof; that is, the value of the oil or gas less reasonable cost of production." 1 Summers, Oil & Gas § 24, at 54–60 (1954) (citing, as being in accord, Bender v. Brooks, supra).

17. See notes 1 and 12, supra.

prompted three of the parties to make approximately 100% settlement, for a total amount equal roughly to the value of ⅓ of the oil produced during the last two years. In view of this, they contend that the costs to be allowed, if any, should be apportioned to account for the settlements.

■■■ Quite apart from the wide and general discretion in the trial court to assess special costs, one unique factor of this record has been completely ignored in these attacks. The trial court, with no objection indicated by any party, entered a special order providing for the Sperry-Sun survey. This accorded valuable rights to all, not the least of which was the right of the defendants to have copies of the reports and annexed data. The order further specifically provided that the expense of the survey on being ascertained would be taxed as costs. Later on, the formal pretrial order, F.R. Civ.P. 16, which did reserve the law question of taxability, fixed the dollar amount of the expense. No objection has ever been made as to the amount.

■■■ But in any event, we have no doubt as to the acceptability of the taxation of these costs. While it is true that the rule allowing this kind of discovery, F.R.Civ.P. 34, does not mention costs, the power of the trial Judge to tax as costs the necessary and reasonable expenses incurred in discovery procedures can hardly be doubted. Under F.R.Civ.P. 54(d), the allowance of costs to the prevailing party is within the discretion of the trial Judge, and his determination will be sustained unless he lacks the power [18] to tax a particular item or abuses

his discretion. 3 Barron & Holtzoff, Federal Practice & Procedure § 1195 (Wright ed. 1958). Reasonable and necessary expenses for depositions as well as the cost of "preparing models, drawings, charts, photographs and other exhibits may be a taxable expense, * * *" 3 Barron & Holtzoff § 1197. Since the well survey was obviously the most scientific and reliable way to determine the critical issue in this case, and there being no doubt as to its reasonableness or necessity, there can be no question as to the trial Judge's power to assess this item against the defendants as costs.

■■ This leaves only the question of the propriety of not apportioning the total expense to take into account the settlements. We hold there was no error. Whatever might have been the influence of the survey report on those who settled, the fact remains that it was these defendants who not only (a) resisted Texaco's claim but, in doing so, (b) challenged the admissibility of the survey evidence. It took a trial to prove each of these positions unsound. The successful plaintiff is entitled to recover its taxable costs to achieve that legal determination. This is a matter properly within the discretion of the trial Judge, and it is sufficient to say that under our system of procedure, being saddled with the entire cost burden is one of the risks of litigation, and avoidance of costs, generally, one of the advantages of settlement.

The result is that the judgment for Texaco was correct.[19]

Affirmed.

18. Cf. United States v. Kolesar, 5 Cir., 1963, 313 F.2d 835.

19. The assignment from defendants to Texaco of funds held in suspense by the pipeline is a matter between the parties relating to the satisfaction, not the amount, of the judgment and one on which we need not pass.