ESTATE OF H. W. DONNELL, DECEASED, WILLIE HAYDEN DONNELL, EXECUTRIX, AND MRS. WILLIE HAYDEN DONNELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2752-65—2754-65.   Filed July 13, 1967.

*Harold D. Rogers* and *Paul W. Eggers*, for the petitioners.
*Harold L. Cook*, for the respondent.

DAWSON, *Judge:* In these consolidated cases the respondent determined the following income tax deficiencies against the petitioners:

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| H. W. Donnell and Willie Hayden Donnell | 2752-65 | 1959 | $8,298.48 |
| | | 1960 | 8,665.87 |
| | | 1961 | 10,805.78 |
| H. W. Donnell | 2753-65 | 1963 | 1,343.31 |
| Willie Hayden Donnell | 2754-65 | 1963 | 1,343.32 |

In docket No. 2752-65 the year 1962 is involved because of a net operating loss carryback to the year 1959. Petitioners filed separate community income tax returns for 1962 and 1963.

Three issues are presented for our decision. They are:

(1) Whether the petitioners are entitled to deduct as intangible drilling and development expenses the amounts of $15,334.05 in 1959 and $12,949.31 in 1960 for drilling on four illegally deviated oil wells bottomed outside of property on which they had a working interest in the Ephriam lease.

(2) Whether the petitioners are entitled to the depletion deductions claimed in 1961 and 1962 with respect to oil produced from four illegally deviated oil wells bottomed outside of property on which they had a working interest in the Ephriam lease.

(3) Whether the petitioners constructively received additional taxable income of $5,118.25, $8,523.04, and $6,668.15 in the years 1961, 1962, and 1963 from an oil production payment made to another in connection with the Fleming lease where the petitioners guaranteed the payout of the production payment.

The resolution of a fourth issue pertaining to a claimed net operating loss carryback from 1962 to 1959 will depend upon our decisions on the other three issues and can be given effect in the Rule 50 computation.

554

The facts have been stipulated by the parties. Their stipulation and the exhibits attached thereto are incorporated herein by this reference and are hereby adopted as our findings. To the extent pertinent they are set out below.

H. W. Donnell and Willie Hayden Donnell (hereinafter called petitioners) were husband and wife during the years 1959 through 1963 and, at the time the petitions were filed herein, their legal residence was Kilgore, Tex. H. W. Donnell died testate on August 16, 1966. In his will he named his wife, Willie Hayden Donnell, as independent executrix of his estate.

The petitioners filed joint Federal income tax returns for the years 1959, 1960, and 1961, and separate Federal income tax returns for the years 1962 and 1963 with the district director of internal revenue at Dallas, Tex. They used the cash receipt and disbursement method of accounting and reporting of income and expenses with respect to their oil and gas business.

Petitioners were engaged in the oil and gas business and other businesses during the years 1959 through 1963. Petitioners owned a portion of a leasehold working interest in many oil and gas leases. Most of the leases owned by the petitioners were owned in conjunction with other persons.

During the years 1959 through 1962 the petitioners owned an undivided 50 percent of the seven-eighths working interest in the George Ephriam lease located in Rusk County, Tex. This lease was operated by J. D. Laird.

During the period from 1958 through 1961 11 producing oil wells were drilled on the Ephriam lease as follows:

| Year | Number of wells drilled |
|---|---|
| 1958 | 1 |
| 1959 | 2 |
| 1960 | 4 |
| 1961 | 4 |

In 1959 the petitioners were billed by the operator of the Ephriam lease and paid the sum of $15,334.05 representing their share of the intangible drilling and development costs for wells 3 and 4 on the Ephriam lease.

In 1960 the petitioners were billed by the operator of the Ephriam lease and paid the sum of $12,949.31 representing their share of the intangible drilling and development costs for wells 2 and 4 on the Ephriam lease.

Petitioners elected on their first income tax return for which an election was required under section 612, I.R.C. 1954, to deduct as expenses all intangible drilling and development costs and such election continued through the years in controversy. In their Federal income tax returns for the years 1959 and 1960 the petitioners elected to deduct as expenses the costs of wells 3 and 4 in 1959, and the cost of wells 2 and 4 in 1960 on the Ephriam lease. Petitioners also deducted on their income tax returns for all years here in issue all intangible drilling and development costs as to faulty wells or dry holes.

In October 1962 the Railroad Commission of the State of Texas determined that 4 of the 11 wells, namely wells 1 through 4, on the Ephriam lease, were deviated to a greater degree than was permitted by the regulations of the railroad commission. As a result of such determination, these wells have been shut-in. Wells 1 through 4 on the Ephriam lease were drilled into and bottomed in producing oil sands which were outside the verticle extensions of the boundaries of the Ephriam leasehold property.

All of the 11 wells on the Ephriam oil and gas lease were drilled on that lease. None of such wells were surfaced off the Ephriam lease in which the petitioners owned an undivided 50 percent of the working interest. During the years 1959 through 1962 the petitioners had to look to the oil production from the Ephriam lease for the return of their investment in such lease. Petitioners also had an investment in equipment on wells 1 through 4 on the Ephriam lease.

For each of the years 1959 through 1962 the petitioners deducted all of the operating expenses (lifting costs and overhead expenses) incurred in operating the Ephriam lease together with depletion allowable with respect to the lease. None of these expenses were disallowed by respondent in the notices of deficiencies.

All of the oil and gas royalty interests and oil payments owned by other parties in the Ephriam lease were paid by General American Pipe Line Co. in the years here in issue out of the production of the wells on the Ephriam lease.

No claims were made against any owner of any royalty or working interest in the Ephriam lease as to the right to receive oil production from the 11 wells drilled on the lease prior to July 1962.

The oil allowables per oil well on the Ephriam lease, as set by the Railroad Commission of the State of Texas, for the period January 1, 1961, to August 1, 1964, are as follows:

| | \multicolumn{11}{c}{Well No.—} | |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1961** | | | | | | | | | | | | |
| January | $8.00 | $18.33 | $16.90 | $17.70 | $18.70 | $17.72 | $17.70 | ------ | ------ | ------ | ------ | $115.05 |
| February | 8.00 | 18.33 | 16.90 | 17.70 | 18.70 | 17.72 | 17.70 | ------ | ------ | ------ | ------ | 115.05 |
| March | 8.00 | 18.33 | 16.90 | 17.70 | 18.70 | 17.72 | 17.70 | ------ | ------ | ------ | ------ | 115.05 |
| April | 8.00 | 18.33 | 16.90 | 17.70 | 18.70 | 17.72 | 17.70 | ------ | ------ | ------ | ------ | 115.05 |
| May | 8.00 | 18.33 | 16.90 | 17.70 | 18.70 | 17.72 | 17.70 | ------ | ------ | ------ | ------ | 115.05 |
| June | 8.00 | 18.33 | 16.90 | 17.70 | 18.70 | 17.72 | 17.70 | ------ | ------ | ------ | ------ | 115.05 |
| July | Off | 18.66 | 17.50 | 18.02 | 17.20 | 18.50 | 18.44 | ------ | ------ | ------ | ------ | 108.32 |
| August | Off | 18.66 | 17.50 | 18.02 | 17.20 | 18.50 | 18.44 | ------ | ------ | ------ | ------ | 108.32 |
| September | 9.45 | 18.66 | 17.50 | 18.02 | 17.20 | 18.50 | 18.44 | $17.85 | $18.00 | $16.80 | ------ | 170.42 |
| October | 9.45 | 18.66 | 17.50 | 18.02 | 17.20 | 18.50 | 18.44 | 13.46 | 13.66 | 14.77 | $18.38 | 178.04 |
| November | 16.80 | 18.66 | 17.50 | 18.02 | 17.20 | 18.50 | 18.44 | 13.46 | 13.66 | 14.77 | 12.64 | 179.65 |
| December | 16.80 | 18.66 | 17.50 | 18.02 | 17.20 | 18.50 | 18.44 | 13.46 | 13.66 | 14.77 | 12.64 | 179.65 |
| **1962** | | | | | | | | | | | | |
| January | $16.80 | $18.67 | $17.48 | $18.06 | $17.24 | $18.60 | $18.56 | $13.46 | $13.66 | $14.77 | $13.80 | $181.10 |
| February | 16.80 | 18.67 | 17.48 | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 181.10 |
| March | 16.80 | 18.67 | 17.48 | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 181.10 |
| April | 16.80 | 18.67 | 17.48 | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 181.10 |
| May | 16.80 | 18.67 | 17.48 | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 181.10 |
| June | 16.80 | 18.67 | 17.48 | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 181.10 |
| July | 16.80 | 18.67 | Off | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 163.62 |
| August | 16.80 | 18.67 | Off | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 163.62 |
| September | 16.80 | 18.67 | Off | 18.06 | 17.24 | 18.60 | 18.56 | 13.46 | 13.66 | 14.77 | 13.80 | 163.62 |
| October | Off | Off | Off | Off | 15.40 | 20.00 | 20.00 | 20.00 | 12.35 | 9.60 | 9.45 | 106.80 |
| November | Off | Off | Off | Off | 15.40 | 20.00 | 20.00 | 20.00 | 12.35 | 9.60 | 9.45 | 106.80 |
| December | Off | Off | Off | Off | 15.40 | 20.00 | 20.00 | 20.00 | 12.35 | 9.60 | 9.45 | 106.80 |
| **1963** | | | | | | | | | | | | |
| January | Off | Off | Off | Off | $15.40 | $3.89 | $10.66 | $20.00 | $12.35 | $9.60 | $9.45 | $81.35 |
| February | Off | Off | Off | Off | 15.40 | 3.89 | 10.66 | 20.00 | 12.35 | 9.60 | 9.45 | 81.35 |
| March | Off | Off | Off | Off | 15.40 | 3.89 | 10.66 | 20.00 | 12.35 | 9.60 | 9.45 | 81.35 |
| April | Off | Off | Off | Off | 15.40 | 3.89 | 10.66 | 20.00 | 12.35 | 9.60 | 9.45 | 81.35 |
| May | Off | Off | Off | Off | 15.40 | 3.89 | 10.66 | 20.00 | 12.35 | 9.60 | 9.45 | 81.35 |
| June | Off | Off | Off | Off | 15.40 | 3.89 | 10.66 | 20.00 | 12.35 | 9.60 | 9.45 | 81.35 |
| July | Off | Off | Off | Off | 1.70 | 5.25 | 11.33 | 7.28 | 5.10 | 2.30 | 1.80 | 34.76 |
| August | Off | Off | Off | Off | 1.70 | 5.25 | 11.33 | 7.28 | 5.10 | 2.30 | 1.80 | 34.76 |
| September | Off | Off | Off | Off | 1.70 | 5.25 | 11.33 | 7.28 | 5.10 | 2.30 | 1.80 | 34.76 |
| October | Off | Off | Off | Off | 1.70 | 5.25 | 11.33 | 7.28 | 5.10 | 2.30 | 1.80 | 34.76 |
| November | Off | Off | Off | Off | 1.70 | 5.25 | 11.33 | 7.28 | 5.10 | 2.30 | 1.80 | 34.76 |
| December | Off | Off | Off | Off | 1.70 | 5.25 | 11.33 | 7.28 | 5.10 | 2.30 | 1.80 | 34.76 |
| **1964** | | | | | | | | | | | | |
| January | Off | Off | Off | Off | $1.70 | $5.25 | $8.40 | $5.69 | $5.10 | $2.30 | $1.80 | $30.24 |
| February | Off | Off | Off | Off | 1.70 | 5.25 | 8.40 | 5.69 | 5.10 | 2.30 | 1.80 | 30.24 |
| March | Off | Off | Off | Off | 1.70 | 5.25 | 8.40 | 5.69 | 5.10 | 2.30 | 1.80 | 30.24 |
| April | Off | Off | Off | Off | 1.70 | 5.25 | 8.40 | 5.69 | 5.10 | 2.30 | 1.80 | 30.24 |
| May | Off | Off | Off | Off | 1.70 | 5.25 | 8.40 | 5.69 | 5.10 | 2.30 | 1.80 | 30.24 |
| June | Off | Off | Off | Off | 1.70 | 5.25 | 8.40 | 5.69 | 5.10 | 2.30 | 1.80 | 30.24 |
| July | Off | Off | Off | Off | 1.70 | 5.25 | 8.40 | 5.69 | 5.10 | 2.30 | 1.80 | 30.24 |

Of the total gross income received in 1961 by the petitioners from oil sales out of the Ephriam lease, 53.48 percent was produced from the nondeviated wells (5 through 11) and 46.52 percent was produced from the deviated wells (1 through 4).

On January 11, 1961, J. H. Fleming executed and delivered an assignment conveying all of his interest in and to certain oil and gas leasehold properties located in Gregg County, Tex. (hereinafter called the Fleming leasehold), to H. W. Donnell, reserving only a production payment in the principal sum of $35,275, payable out of 85 percent

of all oil, gas, and other minerals produced from the interest transferred in said property plus an additional amount equal to interest at the rate of 6½ percent per annum upon the unrecovered balance of the principal sum. The cash consideration paid by H. W. Donnell for such purchase was $6,225.

On January 11, 1961, the production payment reserved by Fleming in the assignment of the Fleming leasehold to H. W. Donnell was transferred to Calm Corp., a Texas company, for a consideration of $35,275. On the same day, Calm Corp. borrowed $35,275 from the Texas Bank & Trust Co. of Dallas, and as security for such loan Calm Corp. executed a deed of trust conveying the $35,275 production payment to John B. Stigell, Jr., trustee, for the benefit of the Texas Bank & Trust Co. of Dallas.

In a letter dated January 11, 1961, signed by H. W. Donnell to the Texas Bank & Trust Co. of Dallas and the Calm Corp., Donnell agreed that if requested by the holder of the Fleming leasehold $35,275 production payment, or the holder of the $35,275 note, he would purchase same for the unliquidated balances remaining on the production payment or the note.

No request was ever made to H. W. Donnell by Calm Corp. or the Texas Bank & Trust Co. of Dallas to purchase the Fleming leasehold production payment or the note.

After January 11, 1961, 85 percent of all of the income and receipts from the Fleming leasehold were received by the Texas Bank & Trust Co. of Dallas for the account of the Calm Corp. to apply on the liability of Calm Corp. in accordance with the assignment from J. H. Fleming to Calm Corp. dated January 11, 1961, the loan from the Texas Bank & Trust Co. to Calm Corp. on that date, and the deed of trust executed on that date. Calm Corp. realized as gross profit from the purchase of the Fleming leasehold production payment based on the difference between the interest of 6½ percent per annum received on the unliquidated balance of the production payment and 5½ percent interest per annum on the unliquidated balance of its debt obligation to the Texas Bank & Trust Co. of Dallas.

After January 11, 1961, the books and records of petitioners show that 15 percent of all of the income and receipts from the Fleming leasehold were received by H. W. Donnell in accordance with the assignment from Fleming to him dated January 11, 1961.

The Fleming leasehold production payment in the amount of $35,275 which was assigned to Calm Corp. on January 11, 1961, was paid out on June 23, 1964.

Calm Corp. is a Texas corporation with its principal office located in Dallas, Tex. During the years 1962 and 1963 Calm Corp.'s principal

business activity was the acquisition of oil and gas production payments. The net profits of Calm Corp. are held for the benefit of the employees of the Texas Bank & Trust Co. of Dallas.

In the notices of deficiencies dated May 5, 1965, the respondent made certain determinations for the years 1959 through 1963 with the following explanations of adjustments:

1. *Determination as to intangible development expense—1959–1960.*

It is determined that your claimed deduction of $15,334.05 [1959] [$12,949.31 in 1960] for Ephriam lease development expense is unallowable as the costs incurred were for drilling wells not completed on your property.

2. *Determination as to depletion—1961–1962.*

It is determined that 82.44 percent [1961] [78.02 percent in 1962] of the gross income reported from Ephriam lease oil sales was attributable to sales of oil not extracted from your property, therefore, 82.44 percent [1961] [78.02 percent in 1962] of claimed Ephriam lease percentage depletion is unallowable, computed as follows:

|  | 1961 | 1962 |
|---|---|---|
| Amount claimed | $15,421.37 | $4,095.87 |
| Disallowance factor | 82.44% | 78.02% |
| Amount disallowed | 12,713.38 | 3,195.60 |

3. *Determination as to oil runs—Fleming lease—1961, 1962, 1963.*

It is determined that by reason of H. W. Donnell's effective guaranty of a $35,275.00 oil production payment, otherwise payable out of production from the J. H. Fleming lease, Sparks Farm, Gregg County, Texas, you assumed all risk of loss from failure of the production payment, acquired a depletable economic interest therein, and constructively received unreported taxable income computed as follows:

|  | 1961 | 1962 | 1963 |
|---|---|---|---|
| Oil payment proceeds | $12,144.43 | $13,833.03 | $10,269.52 |
| Depletion allowable | (3,500.02) | (3,986.68) | (2,959.68) |
| Interest expense | (3,526.16) | (1,323.31) | (641.69) |
| Taxable | 5,118.25 | 8,523.04 | 6,668.15 |

OPINION

1. *Intangible Drilling and Development Costs.*—Respondent has disallowed the amounts deducted by petitioners as intangible drilling and development expenses which are related to the four deviated oil wells not bottomed within the boundaries of the Ephriam lease. The deficiency notice used the words "not completed on your property." Therefore, the narrow issue to be resolved is whether the intangible drilling and development costs qualify as a deductible expense, as petitioners contend, or whether they must be capitalized, as respondent contends.

Intangible drilling and development costs pertaining to oil and gas wells are capital expenditures because they are permanent improvements which increase the value of the property. They must therefore be capitalized unless an election is made to expense them pursuant to

section 263(c),[1] I.R.C. 1954, and there is compliance with the provisions of section 1.612–4(a)(1),[2] Income Tax Regs.

Noting that an illegally bottomed oil well is an unlawful well from the surface to its bottom since it is not divisible into segments, *Harrington* v. *State*, 385 S.W. 2d 411 (Tex. Civ. App. 1964), the respondent claims that the intangible drilling costs on the deviated wells were not in furtherance of a legal relationship but were only expended as a means of achieving the wrongful acquisition of another party's oil. In his brief respondent states his position, in part, as follows:

> The special provision allowing the deduction of the intangible drilling costs is limited to those costs incurred in the development of oil properties and to the extent of the taxpayer's share of the operating mineral interests in the well. Regulations, section 1.612–4(a). Therefore, intangible drilling costs incurred by a taxpayer are deductible to the extent that they develop his property. Since the intangible drilling costs in question did not, and could not, develop the petitioner's property due to the fact that the wells were illegally deviated and not bottomed on their property, the petitioners must capitalize such costs. Alternatively stated, a lessee-operator does not have any development obligations, indeed, does not have any development rights, with respect to deposits which do not underlie his lease. Since the instant intangible expenses were incurred in drilling wells that were not bottomed in a mineral "property" (as defined in § 614) belonging to the petitioner, respondent submits that these expenditures are not related to "oil and gas properties" within the scope of § 263(c) [as described in Regulations §1.612–4(a)(1)]. Accordingly, they are not eligible for the option to expense provided by section 263(c).

Two reasons are advanced by respondent in support of his disallowance, i.e., (1) the deviated wells were illegal and (2) the petitioners did

---

[1] SEC. 263. CAPITAL EXPENDITURES.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

\* \* \* \* \* \* \*

(c) INTANGIBLE DRILLING AND DEVELOPMENT COSTS IN THE CASE OF OIL AND GAS WELLS.—Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.

[2] Sec. 1.612–4 Charges to capital and to expense in case of oil and gas wells.

(a) *Option with respect to intangible drilling and development costs.* In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Such expenditures have for convenience been termed intangible drilling and development costs. They include the cost to operators of any drilling or development work (excluding amounts payable only out of production or gross or net proceeds from production, if such amounts are depletable income to the recipient, and amounts properly allocable to cost of depreciable property) done for them by contractors under any form of contract, including turnkey contracts. Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used—

(1) In the drilling, shooting, and cleaning of wells.

not have a depletable "economic interest" in the Ephriam lease and by analogy the intangible drilling costs on the deviated wells were not "in furtherance of a legal relationship."

The petitioners counter by arguing that (1) the fact that a well is not bottomed within the boundaries of a particular lease is immaterial and (2) they have satisfied the requirements of the regulations by electing to deduct rather than capitalize such costs and by reason of their ownership of a working interest [3] in the Ephriam lease in 1959 and 1960.

We agree with the petitioners on this issue. Whether a well is bottomed within the boundaries of a particular lease seems to us immaterial and irrelevant. Neither the statute nor the regulations mention such a requirement. Moreover, H. Rept. No. 761,[4] 79th Cong., 1st Sess., which accompanied House Concurrent Resolution 50, approved section 29.23 (m)–16, Regs. 111, giving the "taxpayer" the option to deduct "all expenditures" for intangible drilling costs from gross income as an expense rather than charging them to his capital account. The word "operator" used in section 1.612–4, Income Tax Regs., means "taxpayer." And intangible drilling costs are to be treated like other ordinary and necessary business expenses once the taxpayer elects to expense them. Here the petitioners have complied with both requirements of the regulations because they made an election to deduct such costs and they owned a working interest in the Ephriam lease in 1959

---

[3] The words "working interest" in their ordinary meaning denote the lessee's interest in oil and gas that may be produced from property after the deduction of a royalty paid to the landowner.

[4] H. Rept. No. 761, 79th Cong., 1st Sess., reads, in part, as follows:

The Committee on Ways and Means, to whom was referred the resolution (H. Con. Res. 50), declaring Congress to have recognized and approved the provisions of section 29.23(m)–16 of Treasury Regulations 111 and corresponding provisions of prior regulations, granting the option in the case of oil and gas wells to deduct, as an expense, intangible drilling and development costs, having had the same under consideration, report it back unanimously to the House without amendment and recommend that the resolution do pass.

The purpose of the resolution is to remove any doubt as to the validity of Treasury regulations giving to the taxpayer the option to either capitalize or charge to expense intangible drilling and development costs in the case of oil and gas wells. These regulations have been in effect for more than 28 years, and the Congress has continued, in successive revenue acts adopted since that time, the basic statutory provisions from which such regulations are derived. * * *

The validity of these regulations has been questioned in a recent court action on the theory that the statute providing for deduction of business expenses is ambiguous. However, this position is untenable since the language of the statute is so general in its terms as to render an interpretative regulation appropriate. In practical administration there are admittedly border-line cases between deductible business expenses and nondeductible capital outlays which make such a regulation necessary. Congress has approved the administrative construction adopted in such regulations and has thereby given them the force and effect of law.

* * * * * * *

The uncertainty occasioned by raising doubts as to the validity of these regulations is materially interfering with the exploration for and the production of oil. The Treasury Department and the Bureau of Internal Revenue have announced that they will continue to recognize the regulations under which they now operate unless otherwise directed by Congress.

and 1960. This being so, such expenses are allowable just as respondent has permitted the deduction of all operating expenses with respect to the deviated wells and all depreciation on the equipment located thereon.

Respondent's arguments fail to persuade us. In our opinion he acted myopically by applying the provisions of the regulations to deny petitioners the option of expensing intangible drilling costs. His interpretation of "operator" and its parenthetical definition is too restrictive and, if approved, would thwart the legislative purpose expressed in connection with the passage of House Concurrent Resolution 50. As to the illegality point, the rationale of *Commissioner* v. *Sullivan*, 356 U.S. 27 (1958), is applicable. In that case the Supreme Court held that salaries and rent paid by a bookmaker were deductible and ordinary and necessary business expenses although the taxpayer was conducting an illegal gambling operation. The facts of this case, *a fortiori*, compel the conclusion that the intangible drilling costs are deductible. Petitioners were engaged in the oil and gas business. The intangible drilling costs were incurred in that business whether or not the deviation of the oil wells was wholly innocent.

Secondly, the right to deduct intangible drilling costs is not dependent upon the possession of a depletable economic interest in the Ephriam lease. The regulations do not require a taxpayer to have an "economic interest" in the lease as a condition precedent to the deduction of intangible drilling expenses. Only a "working interest" in the lease is needed, and unquestionably that requirement has been fulfilled here.

Finally, the contention that the intangible drilling expenses are not allowable because they were not incurred in developing the "property" of petitioners finds no support in the statute, the regulations, or any court decisions.

Even if we assumed, *arguendo*, that the petitioners did not develop their own lease, we would nevertheless conclude that such expenses constituted the drilling of faulty or dry holes and are deductible on the same basis as the deduction of any other faulty or dry hole reported in petitioners' tax returns for the years in controversy.

Accordingly, we hold that the petitioners can deduct the intangible drilling and development costs on the illegally deviated oil wells bottomed under adjoining property.

2. *Percentage Depletion Allowance.*—The focal point of this issue is whether the petitioners had an "economic interest" in the oil produced from the wells bottomed beyond the limits of the Ephriam lease. If the petitioners possessed the requisite "economic interest," they were entitled to the depletion allowance deductions for the years 1961 and 1962.

The depletion allowance is a statutory deduction permitted by legislative grace. *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308 (1956). The general statutory provision for the depletion allowance deduction is section 611(a).[5] The rules with respect to percentage depletion are contained in section 613 (a) and (b), which provides, in part, that percentage depletion shall not exceed 50 percent of the taxpayer's taxable income from the property and that the percentage for oil and gas shall be 27½ percent.

The statute does not specify the interest necessary to qualify for a depletion allowance deduction. However, in the bellwether decision of *Palmer* v. *Bender*, 287 U.S. 551, 557 (1933), the Supreme Court set forth two general requirements for a depletable interest which have become commonly known as the "economic interest" concept. In the words of the Supreme Court, an economic interest exists whenever the "taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he might look for a return of his capital." All subsequent Supreme Court cases have adhered to this classic concept. See, e.g., *Parsons* v. *Smith*, 359 U.S. 215 (1959). In *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362 (1938), the concept was refined to provide that if a taxpayer possessed an economic or pecuniary advantage derived from production simply because of a contractual relationship, such economic advantage would not be sufficient to constitute the required economic interest. The economic interest concept is now contained in section 1.611–1(b) (1), Income Tax Regs.[6]

The petitioners maintain that since they have a capital investment in the Ephriam lease this, without more, entitles them to a depletion allowance deduction under section 1.611–1(b) (1), Income Tax Regs., on all income derived from the deviated wells. We cannot agree with this interpretation of the law and the regulations. In our judgment

---

[5] SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *

[6] Sec. 1.611–1. Allowance of deduction for depletion.

(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. Further, depletion deductions with respect to an economic interest of a corporation are allowed to the corporation and not to its shareholders.

neither of the criteria for an "economic interest" exists with respect to oil extracted beyond the boundaries of the Ephriam lease.

Unlike the shoreland owners in *Commissioner* v. *Southwest Expl. Co.*, *supra*, these petitioners had no capital investment in the oil in place outside the boundaries of their property (the Ephriam lease). See *Alphonzo E. Bell Corp.* v. *Commissioner*, 145 F. 2d 157 (C.A. 9, 1944). In that case, where oil and gas were illegally extracted from beneath a taxpayer's property by the use of slanted wells, the taxpayer sued his neighbor for the value of the minerals illegally extracted. Prior to the trial a settlement was reached. The settlement, a lumpsum payment in compromise of the litigation, related not only to the illegal extraction of oil and gas but also referred to potential issues unrelated to oil and gas production. Despite this, the taxpayer claimed a depletion allowance deduction on the entire amount received in settlement. The allowance for depletion was denied because the money paid to the taxpayer was not solely compensation for the illegal production. It is interesting to note, however, that the Court of Appeals assumed that depletion would have been proper if the taxpayer had shown that the amount received represented compensation for oil and gas produced from his property. This Court has ruled in the same manner in cases where mineral properties are operated by trespassers under a claim of right. When the rightful owner of the mineral properties obtains a money judgment, he is entitled to percentage depletion on the amount recovered. See *Estate of Thomas E. Arnett*, 31 T.C. 320, 332 (1958), where we said:

> In our opinion the general rule is that when the owner of or holder of a capital investment in oil and gas in place (which ownership vested or capital investment was made prior to any litigation) receives as the result of litigation a monetary award against a person wrongfully extracting such oil or gas representing the proceeds from its sale, whether in the form of damages or otherwise, the owner is entitled to the percentage depletion deduction provided by statute calculated upon such receipts. * * *

Income from production or from the "property," as that term is defined in section 614(a), must be apportioned among the economic interest holders when computing the depletion deduction. See *Helvering* v. *Twin Bell Syndicate*, 293 U.S. 312 (1934). Here it is abundantly clear that the petitioners did not possess the "economic interest" in the oil in place. It is doubtful whether this is the type of investment which Congress intended to encourage by the enactment of depletion legislation. Indeed, these petitioners seem more remote from possessing an economic interest than the holders of economic advantages who were denied depletion deductions in the coal stripping or casinghead gasoline cases. See *Parsons* v. *Smith, supra; Paragon Coal Co.* v. *Commissioner*, 380 U.S. 624 (1965) ; and *Helvering* v. *Bankline Oil Co., supra*. In those cases the taxpayers at least possessed contractual rights to the income they earned and these petitioners do not.

Secondly, the oil income received by the petitioners from the four deviated wells was not secured by any form of "legal relationship." Clearly the taking of oil in such a fashion was a wrongful conversion which precluded the petitioners from obtaining the oil through any legal relationship. See *Pan American Petroleum Corp.* v. *Long*, 340 F. 2d 211 (C.A. 5, 1964); *Harrington* v. *Texaco, Inc.*, 339 F. 2d 814 (C.A. 5, 1964), for a thorough discussion by Circuit Judge Brown on the rights and liabilities of various parties involved in litigation arising out of the slanted oil well investigations in east Texas in the early 1960's. The requirement that there must be a "legal relationship" to the income derived from the mineral extraction is a vital part of the "income" requisite for an economic interest. Through the choice of the words "legal relationship," we believe the Supreme Court was proceeding on the assumption that the income representing a return of capital must be secured through some arrangement authorized by law, viz, any contractual or lawful right to share in the proceeds of production. Here there is no legal arrangement by which the petitioners could realize income from the four deviated wells. The income was secured by no legal right whatsoever. In fact, the income derived from the deviated wells was actually realized by acts which were illegal and wrongful. While the Supreme Court in the *Palmer* case probably did not contemplate this situation, its use of the words "legal relationship" indicates that it would require at least some kind of contractual or lawful arrangement in its formulation of the economic interest concept. Since there was no contractual or lawful arrangement here, we think there was no "legal relationship" between the petitioners and the "income" derived from the extraction of the oil. There was no permissive legal arrangement through which they could realize income from the oil in place beneath the adjacent oil properties. To be sure, the adjoining property owners have causes of action sounding in tort against the petitioners for any illegal production of their oil. Cf. *Harrington* v. *Texaco, Inc., supra.*

The petitioners rely upon *Anderson* v. *Helvering*, 310 U.S. 404 (1940), arguing that "the Supreme Court has stated that the person required to report the income is entitled to the deduction for depletion." This reliance on *Anderson* is misplaced. The *Anderson* case simply holds that where an economic interest exists the income resulting from that interest is both taxable and subject to depletion. The income from oil wrongfully converted and sold by petitioners is not taxable to them because of any economic interest therein, but because they unlawfully took the property of another. See *James* v. *United States*, 366 U.S. 213 (1961), and compare *North American Oil* v. *Burnet*, 286 U.S. 417 (1932). However, it does not follow that the reporting of such income has the effect of creating an economic interest for petitioners where none otherwise existed.

Petitioners claim that the decision in *Parr* v. *Scofield*, 185 F. 2d 535 (C.A. 5, 1950), controls the issue confronting us in this case. We take a different view. In our opinion the *Parr* case is factually and legally distinguishable. The facts of the *Parr* case are unusual and, as we said in *Estate of Thomas E. Arnett, supra,* they presented "exceptional circumstances" taking the case "outside the general rule."

We conclude that the petitioners are not entitled to depletion allowance deductions with respect to oil produced from the deviated wells bottomed outside their property. But, as our findings of fact show, we agree with the alternative position of petitioners that for the first year (1961) 53.48 percent, rather than 17.56 percent, of the oil produced from the Ephriam lease constituted oil from the seven non-deviated wells. Therefore, the petitioners are entitled to depletion on 53.48 percent of the gross income from the Ephriam lease in 1961. Respondent's determination as to 1962 (21.98 percent of gross income from the Ephriam lease) is sustained.

*3. Oil Production Payment.* The petitioners' primary contention is that they are taxable on only 15 percent of the oil sales from the Fleming lease because that was the only portion of the income they actually received therefrom, the remaining 85 percent was not applied to any debt obligation of theirs, and the reservation by J. H. Fleming in his assignment to H. W. Donnell provided that such reserved production payment should be paid solely out of oil.[7] Respondent, on the other hand, contends that the petitioners constructively received additional income in the years 1961, 1962, and 1963 since there was a guaranty of the amounts paid on the production payment by virtue of Donnell's letter of January 11, 1961, to Calm Corp.

To bring this issue into sharp focus we will reiterate the occurrences of January 11, 1961. J. H. Fleming, for $6,225, executed an assignment of his working interest in a Gregg County oil and gas lease to H. W. Donnell, reserving a $35,275 production payment, with 6½ percent interest, payable out of 85 percent of the oil and gas produced. The production payment reserved by Fleming was assigned to Calm Corp. for $35,275. Calm Corp. borrowed $35,275 at 5½ percent interest from the Texas Bank & Trust Co. of Dallas and, as security for the loan, executed a deed of trust conveying the production payment to a trustee for the benefit of the Texas Bank & Trust Co. At the same time H. W. Donnell, by letter dated January 11, 1961, to the Texas Bank & Trust Co. and to Calm Corp., expressly covenanted and agreed that if re-

---

[7] An oil payment, frequently used in the oil and gas industry, is the right to receive a fixed stipulated share of oil when, as and if produced from a given well or tract, until an agreed amount has been received by the owner of the oil payment. It may be paid either in the mineral produced or in the cash proceeds realized from the sale of such production and may be carved out of a fee interest, a leasehold, a royalty, an overriding royalty, a larger oil payment, or a net profit interest. For income tax purposes an oil payment is an economic interest in the oil in place.

quested by the holder of the production payment, or the holder of the $35,275 note, he would purchase same for the unliquidated balances remaining on the production payment or the note. The letter specifically stated that "as an inducement to Calm Corporation to purchase said Production Payment from J. H. Fleming and as an inducement to Texas Bank & Trust Company of Dallas to loan to Calm Corporation the monies with which to purchase said Production Payment" Donnell was making the agreement. Calm Corp. is a Texas corporation that acquires oil and gas production payments and its net profits, if any, are held for the benefit of the employees of the Texas Bank & Trust Co. After January 11, 1961, 85 percent of the income from the Fleming lease was received by the Texas Bank & Trust Co. to apply on the loan to Calm Corp. The remaining 15 percent of the income from the Fleming lease was received by the petitioners and reported by them on their Federal income tax returns. No request was ever made of Donnell to purchase the production payment. The production payment was made from the proceeds received from the sale of the oil and was fully paid out on June 23, 1964.

In our view the decision of the Supreme Court in *Anderson* v. *Helvering*, 310 U.S. 404 (1940), compels the conclusion that the oil production payments must be included in the income of petitioners. The issue in that case was whether Anderson, Pritchard, and another person as lessees had to include in their gross income money received and paid over to the Oklahoma Co. on an oil payment which was not payable only out of oil production. In the *Anderson* case, the Oklahoma Co. owned certain royalty interests, fee interests, and deferred oil payments. In 1931 the Oklahoma Co. conveyed these interests without reservation to Pritchard, acting for himself, Anderson, and another person. In return, the Oklahoma Co. was to receive $160,000, payable $50,000 in cash and $110,000 with 6-percent interest from one-half of the oil and gas proceeds from the properties and the sale of fee title to any of the land conveyed. "Oklahoma Company was to have in addition a first lien and claim against 'that one half of all oil and gas production and fee interest * * * from which the $110,000 is payable,' the lien and claim 'not in any way [to] affect the one-half interest in all oil and gas production and fee interest or the revenue therefrom which * * * [it] is to have and receive under this agreement.'" The agreement recited that the Oklahoma Co. desired to sell all its rights, title, and interest in the properties. When Pritchard received the gross proceeds of the oil production, he distributed one-half to Oklahoma Co. pursuant to the contract.

The Commissioner determined deficiencies against Anderson and Pritchard by adding to their gross income their share of the oil production paid to Oklahoma Co. In upholding the Commissioner's

determination, the Supreme Court reviewed case law as to whom income derived from the production of oil and gas is taxable and to whom a deduction for depletion is allowable. It stated that oil payments are income to the assignor when they are payable solely out of oil production. The Supreme Court then made the following statements in regard to production payments (pp. 412–413) :

> The reservation of an interest in the fee, in addition to the interest in the oil production, however, materially affects the transaction. Oklahoma Company is not dependent entirely upon the production of oil for the deferred payments ; they may be derived from sales of the fee title to the land conveyed. * * * We are of opinion that the reservation of this additional type of security for the deferred payments serves to distinguish this case from *Thomas* v. *Perkins. It is similar to the reservation in a lease of oil payment rights together with a personal guarantee by the lessee that such payments shall at all events equal the specified sum.* * * * In the interests of a workable rule, *Thomas* v. *Perkins* must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas. * * * [Emphasis supplied.]
>
> Petitioners, as purchasers and owners of the properties, are therefore taxable upon the gross proceeds derived from the oil production, notwithstanding the arrangement to pay over such proceeds to Oklahoma Company. See *Helvering* v. *Clifford*, 309 U.S. 331; *Reinecke* v. *Smith*, 289 U.S. 172, 177 ; *Old Colony Trust Co.* v. *Commissioner*, 279 U.S. 716.

Petitioners claim that the assignment of January 11, 1961, from Fleming to Donnell, containing the reservation of the production payment by Fleming, satisfies the *Anderson* rule, i.e., the *instrument of conveyance* did not contain any provisions whereby the lessor (Fleming) could look to other than oil and gas production for the payment of the reserved production payment. In other words, they argue that unless the additional security is contained in the *instrument of conveyance*, then the production payment is not taxable income to Donnell. This would exalt form over substance which, of course, we are unwilling to do. In Federal taxation, ever since *Eisner* v. *Macomber*, 252 U.S. 189 (1920), the bonfire of substance has overshadowed the flickering flame of form. Cf. *Gregory* v. *Helvering*, 293 U.S. 465 (1935) ; *Helvering* v. *Lazarus & Co.*, 308 U.S. 252 (1939) ; and *Helvering* v. *Tex-Penn Co.*, 300 U.S. 481 (1937). To draw the gossamer distinction urged by petitioners would hardly achieve "the attainable certainty that is such a desideratum in tax matters." *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25, 37 (1946), separate opinion of Justice Frankfurter.

It is plain that Donnell's letter of January 11, 1961, was the inducement for Calm Corp. to buy the oil production payment and for Texas Bank & Trust Co. to loan Calm Corp. funds with which to buy the production payment. There was consideration for the agreement. It was valid. It was an effective guaranty of the production payment

and Donnell would have been personally liable if he had refused to purchase it on demand. See *Able Finance Co.* v. *Whitaker*, 388 S.W. 2d 437 (Tex. Civ. App. 1965). In short, the guaranty was part and parcel of the production payment. As payments were made on the oil production payment, any possible liability of Donnell was reduced with regard to it. Since Calm Corp. (or Texas Bank & Trust Co.) did not have to look merely to oil production for satisfaction of the oil payment, but instead could look to the personal guaranty of Donnell, we think this situation comes within the ambit of the *Anderson* rationale. Cf. *Roeser & Pendleton, Inc.*, 15 T.C. 966, 970–973 (1950), affd. 196 F. 2d 221 (C.A. 10, 1952). In a true production payment situation the owner must look for his security only to production from the properties from which the payment is carved. Agreements imposing a personal and absolute liability to pay, although indicating production as the source from which payment is to be made, are not true production payments but are like mortgages of property for the purpose of securing a loan. See *Refiners Production Co.*, 43 B.T.A. 481, 494 (1941); and *Delacroix Corporation*, 13 T.C. 827, 839 (1949).

Petitioners' reliance on *Putnam* v. *Commissioner*, 352 U.S. 82 (1956), misses the mark because here we are dealing with the receipt of taxable income, not whether payments by a guarantor of a note are deductible as a business or nonbusiness bad debt.

Alternatively, the petitioners contend that, in substance, they acquired two separate property interests, namely, (1) the working interest, subject to a production payment payable out of oil produced until liquidated, which had a cost of $6,225 and (2) a production payment in the amount of $35,275 which had a cost of $35,275. We reject this contention. While the courts originally tended to reach the conclusion that two separate property interests were created, the decisions since *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958), have usually supported the Commissioner. Thus in *Herndon Drilling Co.*, 6 T.C. 628, 636–637 (1946), a pre-*Lake* case involving a subsequent sale, this Court found that a working interest and an oil payment simultaneously acquired in one transaction were separate properties and, in *R. B. Cowden*, T. C. Memo. 1955–128, expressed the same view with respect to an oil payment and royalty retained in a leasing transaction. However, in the more recent case of *Floyd* v. *Commissioner*, 309 F. 2d 95 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court, the opposite view was taken with respect to simultaneous reservation of an oil payment and a royalty, and the sale of the retained oil payment was held to be a carve-out from the larger single interest retained. See also *United States* v. *Foster*, 324 F. 2d 702 (C.A. 5, 1963), but see contra, *Barby* v. *Wiseman* (W.D. Okla. 1966, 66–1

U.S.T.C. par. 9467, 17 A.F.T.R. 2d 1233), on appeal (C.A. 10). Although the law on this issue is not completely settled, we prefer to follow our decision in *Floyd* rather than *Herndon*. Therefore, we hold that the petitioners acquired only a single property interest for which they eventually paid a total of $41,500.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*