H. M. HARRINGTON, JR., AND MARGUERITE HARRINGTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3061-64.    Filed September 29, 1967.

*H. M. Harrington, Jr.,* pro se, and *J. W. Tyner* for the petitioners. *Sidney B. Williams,* for the respondent.

HOYT, *Judge:* The respondent determined the following income tax deficiencies against the petitioners:

| Year | Deficiency |
|---|---|
| 1959 | $11, 778. 23 |
| 1960 | 7, 401. 92 |
| 1961 | 12, 500. 37 |

After concessions by the parties the only issues remaining for our determination are:

(1) Whether the petitioners are entitled to certain depletion deductions claimed with respect to oil produced from illegally deviated oil wells bottomed outside of leased property in which they held interests in the East Texas and Hawkins fields.

(2) Whether respondent's determinations for 1959 and 1960 are invalid because they resulted from a reaudit and reexamination which followed an earlier examination resulting in notification to petitioners that the returns for those years were being accepted as filed.

(3) Whether petitioners are entitled to an increased net operating loss carryback deduction from 1962 to 1959 which in turn depends upon whether they are entitled to a depletion deduction for that year on some of the same leases deviated beyond the lease limits and bottomed in neighboring oil properties.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and such facts are adopted as our findings and by this reference are incorporated herein together with the stipulated exhibits.

Petitioners are H. M. Harrington, Jr., and Marguerite Harrington, husband and wife, and at the time of filing their petition herein their legal residence was Longview, Tex. They filed joint income tax returns for the years 1959, 1960, 1961, and 1962 with the district director of internal revenue at Dallas, Tex. Petitioner H. M. Harrington, Jr., is a practicing lawyer, but, during the tax years involved, the petitioners owned investments in certain oil and gas properties and their income for the years involved was derived primarily from these sources.

The petitioners' 1959 and 1960 income tax returns were audited by the Internal Revenue Service and approved without change. By letter dated November 7, 1961, the district director at Dallas notified petitioners that the examination for those years had disclosed that no change was "necessary to the tax reported" and that the returns "will be accepted as filed."

Following the so-called slant-hole investigation of 1962 by the State of Texas Railroad Commission, the respondent reaudited the petitioners 1959 and 1960 income tax returns, audited the 1961 return, and, *inter alia*, disallowed all oil and gas depletion allowance deductions on leases claimed by the respondent to contain one or more wells deviated and bottomed outside of petitioners' property. Accordingly, respondent determined deficiencies in income taxes for the years 1959, 1960, and 1961 in the respective amounts of $11,778.23, $7,401.92, and $12,500.37. These determinations were made on a reasonable basis and were not arbitrary. The deficiencies which remain unconceded by petitioners result from the disallowance by the respondent of depletion allowances for these years in the respective amounts of $17,410.81, $15,121.17, and $17,771.17.[1]

---

[1] Petitioners have conceded that certain operating and development expenses which respondent disallowed are, in fact, not allowable. These concessions in no way affect the other issues present.

Also in issue is the matter of a net operating loss carryback from 1962 to 1959. Respondent concedes that petitioners are entitled to such a deduction in the amount of $18,171.55. Petitioners contend that they are entitled to a carryback deduction of $22,003.32. This difference of $3,831.77 represents depletion claimed by petitioners in their 1962 return and disallowed by respondent, the disallowance again being based upon respondent's claim that certain of petitioners' wells were either deviated or nonproductive. Each of the leases in issue for the year 1962 is also in issue for the years 1959, 1960, and 1961. However, a greater number of leases and wells are in issue for these prior years, as the number of producing leases owned or operated by petitioners decreased considerably in 1962 for several reasons (including sanctions imposed by the Railroad Commission of Texas).

In the State of Texas, when an operator desires to drill or deepen an oil or gas well, he is required to file a document known as a form 1 with the Railroad Commission of Texas. This document states the name of the company or operator as well as a description of the lease and the location of the surface of the well with respect to the boundaries of the lease. A lease plat or map is required to be attached to the form 1 showing the surface location of the well, as well as the boundaries of the lease. The Railroad Commission after passing upon the application will either issue a permit to drill the well or will deny the application. After the completion of the drilling of the well, the operator is required to file a completion report setting forth the depth of the well, surface pipe, production pipe, production capacity, and other pertinent data with respect to the well. In certain cases the drilling permits specify and require that a survey report also be filed following the completion of drilling.

During the years involved the petitioners owned a working interest in the H. M. Harrington-Tom B. Blackstone lease, previously known as the J. K. Maxwell-Tom B. Blackstone lease. There were two wells on the Tom Blackstone lease—wells 1–B and 2.

During the years involved the petitioners owned a working interest in the lease known as the T. F. Patton-Betty Coleman lease. There were 11 wells on the Betty Coleman lease.

During the years involved petitioners owned a working interest in a lease known as the W. J. Durham lease, which lease contained one well known as the No. 1 Durham well. In November 1961, the Durham lease was consolidated with the Van Sickle lease and the Ervin lease. The Van Sickle lease and the Ervin lease each had one well. After the consolidation, the Durham well became the Ralph Massad-Consolidated Royalties, Inc., well 1, the Ervin well became No. 2, and the Van Sickle well became No. 3.

During the years involved petitioners owned a working interest in the G. A. Erwin lease, also known as the Jack Peterson–J. T. Florence

lease and the Ralph Massad lease. According to the form 1, both the surface and the bottom of the well were to be located on the Ralph Massad lease. By permission of the Railroad Commission, however, the surface of the well was located on an open corner of Danville and Knowles Street as shown by the lease plat. The Railroad Commission granted permission to locate the bottom of the well on the Ralph Massad lease.

During the period involved petitioners owned a working interest in the lease known as the L & G Oil Co.-W. L. Fuller lease. There were three wells on this lease, well 1 (previously well 3), 2, and 4-A. During the latter part of 1962 the Railroad Commission caused wells 1(3), 2, and 4-A on the W. L. Fuller leases to be severed, thus prohibiting any further sales of oil from the three wells on this lease. On September 19, 1962, L & G Oil Co., the operator of the Fuller lease, applied to redrill well 1(3) on the W. L. Fuller lease. Well 1(3) was redrilled pursuant to the form 1 dated September 19, 1962, and is now producing oil. Since the severance of wells 2 and 4-A on the Fuller lease, no application has been made to the State Railroad Commission for a new allowable with respect to those two wells.

During the years involved petitioners also owned a working interest in the lease known as the W-L Operators-R. F. Green lease. There were two wells on that lease known as wells 1 and 2.

During the years involved the petitioners owned a working interest in the lease known as the H. M. Harrington, Jr.-Ann E. Miller lease. There was one well known as well 1 on the Ann E. Miller lease. This well was one of the wells involved in *Harrington* v. *Railroad Commission of Texas*, 375 S.W. 2d 892 (1964). It was redrilled as a result of that decision and is now producing on the Railroad Commission allowable schedules.

During the period involved the petitioners owned a working interest in the lease known as the Douglas Godfrey-Oscar Mitchell lease. There was one well known as well 1-B on the Oscar Mitchell lease.

During the years involved petitioners owned a working interest in the lease known as the H. M. Harrington, Jr.-W. F. Neal lease, also known as the Roy G. Carter-W. F. Neal lease. There was one well on the W. F. Neal lease known as well 1-A. This well was one of the wells involved in *Harrington* v. *Railroad Commission of Texas*, 375 S.W. 2d 892 (1964). It was redrilled as a result of that decision and is now producing on the Railroad Commission allowable schedules.

During the years involved the petitioners owned a working interest in the lease known as the Douglas Godfrey-W. H. Prince lease, previously known as the M. D. Kelley-W. H. Prince lease.

During the years involved the petitioners owned a working interest in the Skipper-Garner B lease operated by H. M. Harrington, Jr., which consisted of 6.13 acres in the northeastern portion of the Skip-

per-Garner tract. The 6.13-acre lease is presently known as the Baton Swabbing Co.-Skipper Garner lease.

During the years involved the petitioners owned a working interest in the lease known as the H. M. Harrington, Jr.-Smith-Hargis lease, also known as Hargis-Smith and also known as George & Wrather Drilling Co.-Smith-Hargis (Hargis-Smith). There was one well known as well 1 on the Smith-Hargis lease.

During the years involved the petitioners owned a working interest in a 20-acre lease known as the H. M. Harrington, Jr.-Texas & Pacific Coal & Oil Co. lease, also known as Hal Co.-T&P Coal & Oil Co. There was one well on the T&P Coal & Oil Co. lease known as well 1.

During the years involved the petitioners owned a working interest in the lease known as the H. M. Harrington, Jr.-H. C. Alexander lease. There were two wells on that lease, will 5 and well 7. At the time that H. C. Alexander well 5 was drilled, the H. C. Alexander lease included the Galvez Oil Corp.-H. C. Alexander lease and the H. M. Harrington, Jr.-H. C. Alexander lease. Well 5 was bottomed under what is shown on the lease plat as the Galvez Oil Corp.-H. C. Alexander lease. Prior to the period in issue the H. C. Alexander lease was divided into what is shown on the plat as the Galvez Oil Corp.-H. C. Alexander lease and the H. M. Harrington, Jr.-H. C. Alexander lease. Well 7 was deviated but was bottomed under the H. M. Harrington, Jr.-H. C. Alexander lease. The Railroad Commission caused pipeline connections to both wells 5 and 7 to be severed in 1962. The Railroad Commission subsequently granted a new allowable for well 7 and that well is now producing. Well 5 was one of the wells involved in *Harrington* v. *Railroad Commission of Texas*, 375 S.W. 2d 892 (1964). It was redrilled as a result of that decision and is now producing on the Railroad Commission allowable schedules. At trial it was stipulated that following the redrilling well 5 was bottomed under the Harrington lease.

Totally, petitioners owned working interests in 14 separate leases which interests were obtained either as original oil and gas leases or by the assignment to petitioners of preexisting oil and gas leases. The parties have stipulated that petitioners retained a right under these transactions to share in the oil produced and have made investments thereunder in the respective properties; also that under each contract petitioners are required to look to the oil in place as the sole source of the return of the capital invested.

Of the 14 leases involved, 9 were single-well leases during the period before the Court; that is, these 9 leases had one well each surfaced upon them. The single-well leases are designated as follows:

| | | |
|---|---|---|
| W. J. Durham | Oscar Mitchell | Skipper-Garner |
| G. A. Erwin | W. F. Neal | Smith-Hargis |
| Ann E. Miller | W. H. Prince | T&P Coal & Oil Co. |

We shall refer to these 9 single-well leases collectively as the single-well group.

The 5 remaining leases, to which we may refer occasionally as the multiwell group, are all multiwell leases upon which are surfaced two or more wells each. The 5 leases comprising the multiwell group are designated as follows:

| | |
|---|---|
| H. C. Alexander | ( 2 wells) |
| Tom Blackstone | ( 2 wells) |
| Betty Coleman | (11 wells) |
| W. L. Fuller | ( 3 wells) |
| R. F. Green | ( 2 wells) |
| | (20 wells) |

Of the leases described above, the following leases were located along the east side of the East Texas field:

| | |
|---|---|
| Betty Coleman | Skipper-Garner |
| W. L. Fuller | Smith-Hargis (Hargis-Smith) |
| Ann E. Miller | H. C. Alexander |
| W. F. Neal | J. T. Florence (G. A. Erwin) |

The East Texas field produces from the very porous Woodbine sand. It is a common pool reservoir of irregular shape with zigzagged edges, produced by means of a water drive from the west to the east.

Of the leases described above, the following leases were located along the edge of the eastern half of the Hawkins field:

| | |
|---|---|
| Tom B. Blackstone | W. H. Prince |
| Consolidated Royalties (W. J. Durham) | Oscar Mitchell |
| | Texas & Pacific Coal & Oil Co. |
| R. F. Green | |

The Hawkins field also produces from the very porous Woodbine sand. The East Hawkins field involved, as distinguished from the West Hawkins field not here involved is a common pool reservoir produced by water drive from the base of the Woodbine at its oil-water contact. It is domal-type structure with water drive toward the center; from the east the drive is toward the west.

Following is a schedule setting forth the sales reported, the depletion allowance claimed by petitioners with respect to these leases, and the depletion deductions disallowed by respondent:

| Lease returned | 1959 | | 1960 | | 1961 | |
|---|---|---|---|---|---|---|
| | Sales | Depletion | Sales | Depletion | Sales | Depletion |
| H. C. Alexander | | | $529.90 | | $2,044.10 | $59.58 |
| Tom Blackstone | $11,277.40 | $3,101.29 | 9,478.92 | $2,606.70 | 9,082.81 | 2,497.77 |
| Betty Coleman | | | 6,061.63 | | 14,358.59 | 2,851.40 |
| W. J. Durham | 5,209.41 | 1,432.59 | 4,363.87 | 1,200.06 | 3,896.15 | 1,071.44 |
| G. A. Erwin | 860.96 | 236.76 | 708.86 | 181.01 | 1,749.81 | 481.20 |
| W. L. Fuller | 3,101.34 | 852.87 | 3,510.15 | 965.29 | 4,213.96 | 1,168.84 |
| R. F. Green | 14,979.30 | 4,119.31 | 12,652.60 | 3,479.47 | 12,077.18 | 3,321.22 |
| Ann E. Miller | 1,701.10 | 467.80 | 1,429.56 | 393.13 | 1,256.30 | 200.62 |
| Oscar Mitchell | 1,948.05 | 535.71 | 1,628.92 | 447.95 | 1,602.08 | 440.57 |
| W. F. Neal | 5,928.83 | 1,630.43 | 5,948.55 | 1,635.85 | 5,838.47 | 1,605.58 |
| W. H. Prince | 1,305.85 | 33.37 | 1,136.95 | | 1,062.46 | |
| Skipper-Garner (H) | 2,249.71 | 618.67 | 1,892.41 | 520.41 | 1,889.90 | 519.72 |
| Smith-Hargis | 983.11 | 270.36 | 829.95 | 224.95 | 758.84 | 208.68 |
| T&P Coal & Oil Co | 14,951.46 | 4,111.65 | 12,604.92 | 3,466.35 | 12,198.35 | 3,354.55 |
| Subtotals | 64,496.52 | 17,410.81 | 62,777.19 | 15,121.17 | 72,029.00 | 17,771.17 |
| Depletion disallowed | | 17,410.81 | | 15,121.17 | | 17,771.17 |

In connection with some of the oil wells here involved reports of surveys following drilling were filed with the Texas Railroad Commission. Some of these were required to be filed by the drilling permits and others were not. Drilling permits which required the subsequent filing of directional survey reports were for the following wells:

| Well surveyed | Surveyor | Date |
|---|---|---|
| Tom Blackstone well 1B | Eastman Oil Well Survey Co | May 1952 |
| Tom Blackstone well 2 | Schlumberger Well Surveying Co | May 1958 |
| Erwin (Ralph Massad) well 1 | Eastman Oil Well Survey Co | March 1952 |
| Oscar Mitchell well 1B | Eastman Oil Well Survey Co | July 1953 |
| Skipper-Garner well 1A | Eastman Oil Well Survey Co | February 1949 |
| Coleman well 1A | Houston Oil Field Material Co | January 1959 |

Although survey reports were filed with the Railroad Commission for other wells here involved they were not required by the drilling permits therefor. These included the following wells:

| Well | Surveyor | Date |
|---|---|---|
| Coleman well 2 | Schlumberger Well Surveying Co | June 1953 |
| Durham Consolidated well 1 | Zerky Hobbs | May 1957 |
| Green well 2 | Eastman Oil Well Survey Co | October 1951 |
| Smith-Hargis well 1 | Eastman Oil Well Survey Co | August 1950 |

These survey reports indicate that the respective wells surveyed at the dates indicated were bottomed beneath the leases on which the wells were drilled.

During the summer of 1962, the State of Texas Railroad Commission and/or the attorney general of Texas caused directional surveys to be conducted on all of the 14 leases here involved as part of the

slant-hole investigation of certain oil fields in East Texas.[2] Of these well surveys performed on petitioners' leases, all but one were conducted by the Sperry-Sun Well Surveying Co., though on certain surveys employees of independent contractors provided the cable or line with which the surveying instruments were lowered into the well shafts.[3] At all times these "outside" employees were under close supervision of trained Sperry-Sun engineers. The purpose of the surveys conducted as part of the slant-hole investigation was to determine whether the bottom of any given well shaft was deviated beyond legal limits from the surface location of the top of the well. Sperry-Sun Well Surveying Co. conducts oil well surveys throughout the oil industry and had performed numerous surveys in the past for both the major oil companies and smaller independent operators. Additionally, Sperry-Sun runs surveys for mining companies and the Atomic Energy Commission. Sperry-Sun is a leader among those companies which engage in underground surveying.

All of the surveys performed by Sperry-Sun on the 13 leases which the company surveyed were gyroscopic (as opposed to magnetic). The principal difference between the magnetic survey and the gyroscopic survey is that the former depends upon a magnetic compass to indicate direction, while the latter employs a gyroscope which must initially be oriented to a known direction. In certain situations which are common throughout the oil industry, it is impossible to conduct an accurate magnetic survey of an oil well; the casing, pipes, or other metal necessary to the functioning of a productive well usually makes the employment of a compass impossible, because the metal portions of the well affect the accuracy of the magnet in the compass. Accordingly, the gyroscopic surveying device is frequently used to survey developed wells.

Sperry-Sun has been performing gyroscopic surveys since 1929, using until 1962 an instrument approximately 5 inches in diameter; this instrument proved too wide to fit into the smaller pipes or casings found in some oil wells, so the company worked for many years to develop a smaller gyroscopic unit which could be accommodated by the narrower shafts. By 1962, the smaller instrument, which is approximately 3 inches in diameter, was considered by Sperry-Sun to be

[2] Generally, there are two principal types of oil well surveys, the inclination survey and the directional survey. The inclination survey shows only the degree of inclination of the borehole from the vertical, while the directional survey shows both the inclination of the borehole from the vertical, the direction of the borehole, and the location of the bottom of the hole. Thus, a properly run directional survey can show, through trigonometric computation, the distance in feet which the bottom of the well shaft is deviated horizontally from the surface location of the top of the shaft, as well as the compass direction of that deviation.

[3] The entire survey of the well on the Smith-Hargis lease was performed for the attorney general of Texas by the Eastman Oil Well Survey Co., an established surveyor of oil wells. The survey was not a gyroscopic survey, but was of a nonmagnetic classification known as the oriented survey. It was filed with the Texas Railroad Commission.

perfected and was used commercially for the first time in that year. It is this so-called slim-hole gyroscopic instrument which was used by Sperry-Sun to survey petitioners' wells. The new instrument is based upon the same theory and principle as the larger model, and is essentially a compact version of the larger instrument. The procedures and techniques for running a survey are essentially the same with both instruments.

Prior to its use by the Railroad Commission in the investigation of petitioners' wells, the new slim-hole instrument had been used by surveyors for the commission for other purposes, as well as by three or more major oil companies including Humble, Pan American, and Texaco. Prudently, and in accord with sound engineering principles, before any commercial use whatever was made of the instrument, Sperry-Sun conducted many exhaustive tests to check upon the accuracy of the unit, and the new slim-hole gyroscope is accurate within tolerances generally acceptable to the oil industry and to oil well surveying engineers. The surveys made of the wells on petitioners' leases were performed, supervised, and conducted by experienced, knowledgeable oil well surveyors and assistants.

These survey reports and the other evidence of record affirmatively establish and we find that each of the eight wells in the single-well group of leases surveyed by Sperry-Sun were deviated and bottomed outside the limits of the particular lease on which it was surfaced. The displacements from the surface locations for the single-well group as established by these surveys, the lease plats, maps, and other evidence were as follows:

| Single-well lease | Displacement from surface location to bottom hole location | Distance outside of petitioners' property |
|---|---|---|
| | *feet* | *Approximate feet* |
| W. J. Durham | 693.63 at N. 47° 57' W | 300 |
| G. A. Erwin | 347.84 at N. 65° 37' W | 280 |
| Ann E. Miller | 586.76 at N. 72° 47' W | 100 |
| Oscar Mitchell | 528.10 at N. 44° 52' E | 200 |
| W. F. Neal | 722.58 at S. 77° 52' W | 550 |
| W. H. Prince | 911.20 at N. 60° 48' E | 700 |
| Skipper-Garner | 1042.78 at S. 83° 12' W | 900 |
| T&P Coal & Oil Co | 1664.73 at N. 87° 58' W | 1500 |

We cannot make similar findings with respect to the single well located on the Smith-Hargis lease. The Eastman Oil Well Survey Co. survey report dated June 1962, introduced into evidence over petitioners' objection, disclosed that this well was bottomed 1,474.64 feet at N. 46°32' W. of the surface hole location approximately 1,300 feet beyond the boundary of petitioners' lease at a measured depth of 3,885.57 feet and a true vertical depth of 3,524.18 feet. Petitioners' exhibit, objected to by respondent, also a survey report of Eastman Oil Well Survey Co. but dated August 1950, showed that this same

well was bottomed at 278.45 feet, S. 54°23′ W. at a measured depth of 3,470 and a true vertical depth of 3,450.74.

Neither party produced the surveyor or any other witness to testify as to the training, experience, or skill of the surveyors, the method used, the instruments employed and their condition, or anything else about the surveys so completely conflicting but allegedly made of the same well at the respective dates. Petitioners' survey report was not required to be filed by the drilling permit with the Railroad Commission, nor was there any requirement that the later survey report, introduced by respondent into evidence and made for the attorney general of Texas in connection with the East Texas slant-hole investigation, be filed with the commission. Both survey reports on the Smith-Hargis well were filed with that commission, however, as indicated above.

Respondent, as mentioned, also disallowed depletion deductions on the sales from each lease in the multiwell group. Although respondent did not offer affirmative proof as to the deviation of each well in the multiwell group, the record is sufficient to establish that the wells surfaced upon the multiwell leases were either bottomed outside the limits of their respective leases or were incapable of producing. At least one well on each of the multiwell leases was bottomed outside of petitioners' property on which it was drilled. Other wells were junked or plugged so that at the time of the slant-well investigation in 1962 surveys could not be run on them. Still other wells, though unsurveyed and never plugged, have been allowed to remain in an unproductive state ever since the pipeline connections of all the leases involved were severed in 1962 by order of the Railroad Commission as part of the slant-hole investigation.

The only legal requirements in Texas which must be met before the shutdown wells can be permitted to return to a productive status are the performance of two fairly routine and easily accomplished tests. These tests are simply (1) an inclination survey showing the wells to be legally "straight," and (2) the so-called witness test which is merely visual observation that a given well is capable of producing and does in fact produce oil. Very accommodatingly, the costs of these tests are borne by the Railroad Commission. Therefore, because these tests, necessary to reinstate production, are virtually costless to the operator and/or other owners, and yet have not been run so that production can be resumed, we find that the wells "lying fallow" were either deviated or incapable of production.

As we have stated above, at least one well on each of the multiwell leases was deviated. Of the following wells, all but well 7, surfaced upon the H. C. Alexander lease, were proven to be deviated by Sun-Sperry surveys conducted during the summer of 1962, and Alexander well 5 (one of two wells on that lease), was stipulated to be deviated.

The following wells in the multiwell group were deviated beyond the limits of petitioners' lease and bottomed on neighboring properties as indicated:

| Well | Displacement from surface to bottom hole | Distance outside of petitioners' property |
|---|---|---|
| | | *Approximate feet* |
| H. C. Alexander (containing 2 wells) No. 5 well. | Stipulated to be bottomed outside of petitioners' property. | |
| Tom Blackstone (containing 2 wells) No. 1B well. | 1,404.12 ft. at S. 57°19′ W | 1,000 |
| Betty Coleman (containing 11 wells) No. 4 well. | 1,347.27 ft. at N. 63°39′ W | 1,075 |
| W. L. Fuller (containing 3 wells) No. 1 well. | 214.15 ft. at N. 25°59′ W | 75 |
| R. F. Green (containing 2 wells): | | |
| No. 1 well | 1,956.22 ft. at N. 82°39′ W | 1,700 |
| No. 2 well | 1,339.43 ft. at S. 88°31′ W | 1,400 |

A summary of our findings with respect to the multiwell leases follows:

### Alexander Lease

Well 5 was stipulated to be deviated. The other well on the lease, No. 7, which was not deviated, had an allowable of 20 barrels per day before the Railroad Commission ordered the lease's pipeline connection to be severed in 1962. After well 5 was redrilled and production restored on the lease, the allowable for well 7 (amount allowed to be produced) was 4.49 barrels per day. The evidence does not establish how much oil well 7 had actually produced during the years before us, if any, or the gross sales attributable to any such oil that might actually have been produced from that well. The lease overlay the East Texas field.

### Tom Blackstone Lease

There are two wells on this lease, Nos. 1–B and 2. Well 1–B was subjected to a Sperry-Sun survey and found to be deviated, a fact already found. Some difficulty was encountered prior to the survey by persons responsible for it because well 1–B was junked to hamper surveying. Both wells formerly had allowables of 187 barrels per day, but at time of trial neither well had an allowable. No evidence as to the productivity or gross sales attributable to well 2 which was not illegally deviated beyond petitioners' lease in the years before us is contained in the record.

### Betty Coleman Lease

This lease has 11 wells. In the spring and summer of 1962, an inspector for the Railroad Commission made three different trips to this lease. At the time of these inspections, each well on the lease had a so-called marginal allowable, which meant that each well should be producing every day. On the inspector's first trip to the lease in

May of 1962, wells 3–A, 4–A, and 5, plus other wells, were producing oil. Some of the producing wells on this first inspection of the lease were producing excessive amounts of oil; wells 2, 9, and 11 were not producing at all.

At the time of the inspector's second visit to the lease on June 7, 1962, wells 3–A, 4–A, and 5 were not producing and had no surface pressure. Other wells which had been producing at the time of the first inspection also were not producing. The pipeline connections on the Coleman lease were severed by the Railroad Commission on this date.

The inspector made a third visit to the site of the lease approximately 1 week after his second inspection. On the third visit the inspector attempted to lower a sinker bar into wells 3–A, 4–A, and 5; a sinker bar is simply a weight attached to the end of a wire line which is used in conjunction with a meter to gage the depth to which the weight has been lowered. The sinker bar penetrated no deeper than 125 feet into any well. These wells had been blocked so that it was not possible that survey instruments could be lowered into the well hole. At the time of this third inspection, none of the wells on the Betty Coleman lease were producing oil. By August 14, 1962, it had become possible to perform a directional survey on the well 4–A (the solid objects apparently having been successfully removed) and Sperry-Sun conducted the survey which proved well 4–A to be bottomed substantially outside of petitioners' lease, as already found. No evidence was introduced to show how much oil the wells which were not proven deviated and/or stopped-up actually produced or what percentage of the lease's gross sales was properly allocable to any such production. All wells on this lease were plugged and abandoned at the operator's request in April and May of 1964.

### W. L. Fuller Lease

There were three wells on this lease. Well 1 was proven to be deviated by Sperry-Sun survey as found. Well 1 has since been redrilled and now has an allowable of 6.21 barrels per day. The remaining two wells on this lease were severed by order of the Railroad Commission in 1962 and have no allowables at present; no application for new allowables has been made. Again there was no evidence to show the amount of any oil production or gross sales properly attributable to the wells not proven to be slanted. This lease was over a portion of the oil zone of the East Texas field.

### R. F. Green Lease

There were two wells on this lease, Nos. 1 and 2. Both wells were shown to be bottomed outside of petitioners' property by Sperry-Sun directional surveys, as already found.

At least one well on each multiwell lease was deviated, and other wells were either deviated or did not produce oil. The depletion deduction taken by petitioners and disallowed by respondent was based on the reported sales for an entire lease, and not on a well-by-well basis.

As previously noted, some of petitioners' leases, or portions of them, overlie the East Texas oilfield. Because of the irregular boundaries of the field, dry wells and producing wells there are often in close proximity in these areas. The only foolproof test to determine whether a particular location on a lease is situated over a given reservoir of oil is to drill a well at that location. Except where producing wells were redrilled vertically (after the investigation) on the four mentioned leases, we have already found that the petitioners' producing wells were not bottomed under petitioners' property. Because there is no credible evidence as to the amount of oil production from wells not shown to have been wrongfully bottomed, we cannot say with definition, except where the four wells were redrilled, that any other leases overlay a common pool or reservoir, nor can we determine that wells drilled within the limits of petitioners' leases produced oil at all or in any certain or definite quantity in the years before us.

Petitioners' 1959 and 1960 income tax returns were audited by the Internal Revenue Service and approved without change in 1961. Petitioners received an unsolicited letter to this effect, dated November 7, 1961. The form letter to petitioners from the district director at Dallas simply stated:

Our recent examination of your tax liability for the year(s) indicated above discloses that no change is necessary to the tax reported. Accordingly, the return(s) will be accepted as filed.

After the slant-hole investigation of 1962, petitioners' 1959 and 1960 returns were reaudited and depletion allowances were disallowed on all leases claimed by respondent to have one or more wells bottomed outside of petitioners' property. Petitioners made no objection to the reexamination, only requiring the agent to obtain a letter directing petitioners to "Show us your books." The letter was obtained and petitioners permitted the reexamination and audit. Petitioners now contend, as mentioned, that the letter of November 1961, which they received from the district director amounted to a closing agreement for the years 1959 and 1960, so that, absent misrepresentation or fraud in the return, the respondent was barred from "the re-examination and re-assessment of any tax for the year 1959 or 1960."

## OPINION

The principal question to be decided here is whether petitioners are entitled to the depletion allowance deductions claimed for 1959, 1960, 1961, and 1962 and disallowed by respondent. The determinations of

respondent are presumed to be correct and the burden of proving error therein lies on petitioners. The percentage depletion deductions sought are permitted as acts of legislative grace in recognition of the fact that oil deposits are wasting assets so that the holder of a capital interest in the oil in place should receive compensation for the portion thereof used up by production and make a tax-free recovery of that depleting capital asset. *Parsons* v. *Smith*, 359 U.S. 215 (1959); *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362 (1938); *United States* v. *Wade*, 381 F. 2d 345 (C.A. 5, 1967).

Petitioners contend that they are entitled to the deductions claimed because by investment they have acquired an interest in the oil in place, and secured by legal relationship income derived from the extraction of oil to which they must look for a return of capital. Having thus acquired by investment in a leasing transaction an interest in the oil in place, they argue that when it is shown "that each lease overlies the common pool reservoir of oil," they are entitled to depletion in the oil produced regardless of whether deviation of the wells exists or does not exist. The fact that production is derived from beneath a neighboring lease rather than from under their own they contend is insignificant. Secondly, they urge that the evidence here does not establish that deviation beyond the lease boundaries exists here in any event as to the wells in question. Finally, they half-heartedly urge that respondent is barred from determining deficiencies for 1959 and 1960 because their returns for those years were examined and approved without change by the Internal Revenue Service; they contend that having examined those returns and having advised petitioners that they were accepted as filed, respondent is barred from later determining deficiencies in the absence of fraud, citing sections 7121 and 7605.[4] On brief their principal argument on this issue is to the effect that there was a closing agreement under section 7121.

Taking the last-mentioned argument first, we conclude and hold that respondent was under no disability whatever to issue the deficiency determinations here involved. There is nothing in this record to establish any bar to the issuance of the notices for any year. Neither was respondent foreclosed by a violation of section 7605(b), which the facts of record establish as imaginary.

Clearly, there was no section 7605(b) violation by respondent. That section provides as follows:

(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

---

[4] All statutory references herein are to the Internal Revenue Code of 1954, unless otherwise indicated.

Petitioners were well aware of the second examination of their books and records and did not object to the second audit or inspection prior to filing their petition with this Court. Having acquiesced in the examination, petitioners cannot now complain of it. *Rife* v. *Commissioner*, 356 F. 2d 883, 887 (C.A. 5, 1966), affirming 41 T.C. 732 (1964). Further, in our view, even if objection had been made, the letter obtained at petitioners' request directing petitioners to open their books literally satisfies the statutory requirement that the Secretary or his delegate notify the taxpayer in writing that an additional inspection is necessary. In *Rife*, there had been no such writing, yet respondent was upheld solely on the grounds of the taxpayer's knowledge and acquiescence.

The suggestion that there was a closing agreement within the purview of section 7121, which barred deficiency notices for 1959 and 1960, is equally without merit.[5] That section envisages an agreement knowingly entered into by both parties. The form letter from the district director manifested no intention on either respondent's or petitioners' part to enter into a closing agreement. Petitioners here requested no closing agreement, executed none of the prescribed forms for such agreement, and lent no signature to the alleged agreement. We conclude and hold that there was no closing agreement for the years 1959 and 1960 nor was respondent in anywise barred from issuing the deficiency notices for those years or the other year before us.

As to the principal issue for our decision here, respondent urges that his determination disallowing the depletion allowance deductions claimed be sustained because petitioners had no investment in the oil in place beneath neighboring leases under which the slanted wells were bottomed, and because income derived from the sale of such oil

---

[5] SEC. 7121. CLOSING AGREEMENTS.

(a) AUTHORIZATION.—The Secretary or his delegate is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.

(b) FINALITY.—If such agreement is approved by the Secretary or his delegate (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States, and

(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.

Sec. 301.7121–1(d), Proced. and Admin. Regs., provides that closing agreements "shall be executed on forms prescribed by the Internal Revenue Service." Such agreements are to be signed by both taxpayers in the case of joint liability. Mim. 6383, 1949–2 C.B. 100. Here no agreement form was executed by anyone; the form letter of Nov. 7, 1961, sent out over the signature of the district director was the only form employed.

production was not derived from any form of legal relationship. He argues that even if petitioners' leases were in part located over an oil zone, the extraction of oil by means of slanted wells bottomed outside of petitioners' leases was a wrongful conversion, a trespass so to speak, which could not result in income derived from the extraction of the oil by a form of legal relationship.

The depletion deductions claimed and disallowed here were on sales for an entire lease, not on a well-by-well basis. Petitioners have introduced no evidence to prove or establish what portion of sales from oil was derived from any particular well on the multiwell leases. Almost the only evidence presented by petitioners as to the issue of deviation of the wells consisted of copies of reports of directional surveys of 10 wells allegedly made in earlier years, which reports were filed with the Texas Railroad Commission. As our findings reflect, some of these reports were required to be filed by the commission whereas others were not. Except in those cases mentioned where the drilling permit required that a directional survey be made and reported, petitioners have neither cited nor referred us to any rule or requirement that survey reports be filed. We cannot accept the mere statement on brief, without more, that a permit or rule (unspecified) "would require" the filing of such a report as evidence that this is so.

While we admitted all offered reports into evidence, the entire record now makes it clear that even under the particular Texas statute relied upon by petitioners, those reports *not required to be filed* were not properly admissible. See Tex. Rev. Civ. Stat. Ann. art. 3737c. Also further consideration and an examination of the legislative history of section 7453 of the 1954 Internal Revenue Code, and its predecessor sections, confirm our impression expressed at trial that the law and rules of evidence to be applied are those of the U.S. District Court of the District of Columbia applied in nonjury trials and not particular State statutory enactments on evidentiary matters.[6] Be that as it may, we admitted the exhibits offered by petitioners and have considered them as part of the evidence in the case.

These reports, which are totally unsubstantiated by other testimony or evidence, purport to establish that the wells surveyed were, at least at that time, not deviated beyond the limits of petitioners' leases. Our findings disclose the respective dates of these surveys between February of 1949 and January of 1959; one was made in February of 1949,

---

[6] Sec. 7453 provides that Tax Court trials be conducted in accordance with the rules of evidence applicable in trials without a jury in the U.S. District Court of the District of Columbia. This statute and its precursive provisions were enacted to insure uniformity of the rules of evidence applied by the Tax Court and to obviate the necessity of applying the various and differing rules of evidence of the respective States in which trials are held. 67 Cong. Rec. 1137, 1143–1144 (1925).

one in August of 1950, one in October of 1951, one each in March and May of 1952, one each in June and July of 1953, one in May of 1957, one in May of 1958, and the most recent in January of 1959.

No substantiating evidence was offered by petitioners as to the method used in making these surveys, the experience, training, or skill of the surveyor, the type of equipment or apparatus used in conducting the surveys, and whether or not it was in good operating condition at the time. In fact, no evidence was offered to establish that the surveys reported were in fact ever made, and certainly the completely conflicting evidence of the two surveys made on well 1 of the Smith-Hargis lease by the same surveying company suggests that either one or the other of the surveys was in fact not made, that they were of different wells or that between the first survey in 1950 and the second in 1962 the well was redrilled. Our findings set forth in detail the totally conflicting results of these two survey reports.

On the other hand, the various survey reports offered by respondent were substantiated by supporting testimony of very substantial nature. As our findings reflect, the surveys were made by or under the direction of experienced, capable surveyors, and under carefully tested and supervised conditions. The reliability and trustworthiness of the respondent's survey evidence has been satisfactorily established and our findings have been made accordingly. On the entire record before us we have found and conclude that each of the eight specified wells on petitioners' single-well leases were deviated beyond the lease limits so that all oil production therefrom in the years before us was of oil in place beneath a neighboring property in which petitioners had no investment whatever. The Smith-Hargis single well was not shown to be deviated because respondent's survey of that well was not substantiated in any respect; although the survey report was made for the Texas attorney general and filed with the Railroad Commission as part of the slant-hole investigation begun in 1962 it was not required to be filed as far as this record discloses. Petitioners' evidence consisting of the same surveying company's earlier survey report is no more satisfactory. It also was not required to be filed with the Railroad Commission and is unsubstantiated. Petitioners have not carried their burden of proof with respect to the presumption of correctness which attaches to respondent's determination and so we must also conclude that Smith-Hargis was a slanted well also, there being no reliable or trustworthy evidence that it was bottomed under the lease. We conclude that all nine of the wells on the single-well leases were illegally deviated as respondent determined.

The single-well leases produced the following sales, and depletion allowances thereon were claimed as follows:

| Lease returned | 1959 | | 1960 | | 1961 | |
|---|---|---|---|---|---|---|
| | Sales | Depletion | Sales | Depletion | Sales | Depletion |
| W. J. Durham | $5,209.41 | $1,432.59 | $4,363.87 | $1,200.06 | $3,896.15 | $1,071.44 |
| G. A. Erwin | 860.96 | 236.76 | 708.86 | 181.01 | 1,749.81 | 481.20 |
| Ann E. Miller | 1,701.40 | 467.80 | 1,429.56 | 393.13 | 1,256.30 | 200.62 |
| Oscar Mitchell | 1,948.05 | 535.71 | 1,628.92 | 447.95 | 1,602.08 | 440.57 |
| W. F. Neal | 5,928.83 | 1,630.43 | 5,948.55 | 1,635.85 | 5,838.47 | 1,605.58 |
| W. H. Prince | 1,305.85 | 33.37 | 1,136.95 | | 1,062.46 | |
| Skipper-Garner (H) | 2,249.71 | 618.67 | 1,892.41 | 520.41 | 1,889.90 | 519.72 |
| T&P Coal & Oil Co | 14,951.46 | 4,111.65 | 12,604.92 | 3,466.35 | 12,198.35 | 3,354.55 |
| Smith-Hargis | 983.11 | 270.36 | 829.95 | 224.95 | 758.84 | 208.68 |

As to the remaining five multiwell leases, the evidence of the respondent's survey reports, as amplified and substantiated by testimony and other evidence introduced at trial, establishes that at least one well on each of these leases was slanted and deviated to such an extent that it was bottomed under and produced oil from neighboring property. Our findings reflect the details. After the slant-well investigation by the Railroad Commission, orders severing pipeline connections were made. All that the operators needed to do to reestablish production was to have directional surveys made and a test run to show capability of production. These are at the expense of the Railroad Commission. Yet these simple requirements to restore production were not met at time of trial, and petitioners offered no evidence whatever to explain why production had not been restored if the severed wells were capable of oil production. Respondent argues that the evidence of record strongly supports his determination that the remaining unsurveyed wells were either illegally deviated or incapable of producing. We agree.

Although there were no surveys of some of the wells on the multiwell leases, there was evidence that wells were junked or plugged so as to prevent surveying, others had no surface pressure on inspection, others were either not producing when they should be or overproducing, and others lacked surface gas pressure. Many of the wells have remained plugged and idle ever since they were shut down by order of the Railroad Commission; a suggestion that they are straight and productive makes no sense at all absent any showing whatever that there was any reason for permitting them to remain unproductive. If the wells which have remained unproductive so long were straight and capable of producing, the simple steps outlined above as requirements of the Railroad Commission necessary to permit resumption of production would most assuredly have been taken long since.

If any of the wells on the multiwell leases were not deviated and in fact produced oil during the years in issue, petitioners have failed utterly to establish by a preponderance of evidence that there was

such production or the extent thereof. On the contrary, the evidence is weighted the other way to support the presumptive correctness of respondent's determination rather than to overcome it. We conclude and hold that respondent's conclusion that the wells were bottomed outside of the limits of petitioners' leases or incapable of production must be sustained, and that petitioners have not established that any production of oil that resulted in sales in the years before us was derived from wells bottomed under and producing oil from beneath their leases.

We have only very recently decided that a taxpayer owning a working interest in a lease in the East Texas field is not entitled to deduct claimed depletion allowance deductions with respect to oil produced from illegally deviated wells bottomed outside of the vertical extensions of the lease boundaries. *Estate of H. W. Donnell*, 48 T.C. 552 (1967). We concluded that the petitioners there had no "economic interest" in the oil in place beneath adjoining or neighboring properties. They had no capital investment in such oil to be recovered through the means of depletion allowances nor did they secure the income from the sale of that oil by any form of "legal relationship." The respondent's determinations disallowing such deductions were accordingly upheld on the authority of *Parsons* v. *Smith*, 359 U.S. 215 (1959); *Commissioner* v. *Southwest Exploration Co.*, 350 U.S. 308 (1956); *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362 (1938); *Palmer* v. *Bender*, 287 U.S. 551 (1933); sec. 1.611–1(b)(1), Income Tax Regs.

No useful purpose would be served by repeating here the complete and exhaustive discussion of the legal principles and authorities contained in *Estate of H. W. Donnell, supra*. What was therein stated applies to the petitioners here; they are not entitled to the claimed deductions for depletion with respect to sales of oil produced from their deviated wells bottomed outside of their lease limits beneath the properties of others. They did not possess an "economic interest" in the oil in place produced by means of their slanted wells.

Unlike the petitioners in *Donnell*, petitioners here have not met their burden of showing that any portion of the production in issue was derived from wells legally bottomed beneath their own leases. In *Donnell* it was found from stipulated facts that a specific percentage of oil production in 1 year was derived from seven nondeviated wells located on the single multiwell lease there involved. Here petitioners have not established production on a well-by-well basis and we are unable to find what portion of sales of oil, if any, was derived from straight wells bottomed beneath petitioners' leases. On the contrary, from the evidence before us we have found that all wells here involved were either illegally deviated or nonproductive in 1959, 1960, 1961, and 1962. Respondent's determinations disallowing depletion allow-

ance deductions must therefore be sustained on the authority of *Estate of H. W. Donnell, supra.*

However, as we have mentioned before, petitioners contend additionally that the evidence adduced establishes that each of their leases overlies a reservoir or common pool of oil and that they are entitled to depletion in the oil produced from "the common reservoir regardless of whether deviation exists or does not exist." On brief they state their point as follows:

The Petitioners own an economic interest in the oil (minerals) in place beneath the common pool reservoir overlain by each of their leases, (considered separately) acquired by investment under a leasing agreement and have derived income from the extraction of such oil to which they must look for a return of their capital and accordingly, are entitled to depletion thereon.

The petitioners argue that they have established that each of their leases overlies "a part of the common pool of Woodbine oil involved, and since petitioners owned an 'economic interest' in such common pool of oil they are entitled to depletion on the oil produced from each lease even if the wells thereon were deviated and produced from neighboring properties overlying the 'common pool' of oil."

The evidence of record just does not support petitioners' assertion that their leases were all over the oil in the East Texas and Hawkins fields. After the Railroad Commission severed the pipeline connections at various of the petitioners' leases, some of the wells were redrilled as a result of the opinion in *Harrington* v. *Railroad Commission of Texas*, 375 S.W. 2d 892 (Tex. 1964). In that case Harrington sued to enjoin the Railroad Commission from interfering with his redrilling of three wells here involved—The Neal No. 1A, the Alexander No. 5, and the Ann E. Miller No. 1. The Supreme Court of Texas held that petitioners had the right to redrill those wells which were deviated and "bottomed under a lease in which Harrington owns no interest." After that opinion, the redrilling was completed on these three wells and at time of trial the redrilled wells were producing oil. The three leases therefor did, at least in part, overlie the East Texas oil field even though petitioners did not establish that any of the wells thereon produced oil from beneath their limits in the years before us. However, other wells were not redrilled even though permits therefor were granted. Also, as our findings show, the evidence convinces us that the W. L. Fuller lease was over the East Texas field oil zone. The other 10 leases here involved were not shown to overlie any oil whatever, petitioners' evidence to that effect being very vague, general opinion evidence, which we reject as unconvincing and unreliable. As to those leases, petitioners' argument would not apply and therefore on this principal theory of their case petitioners' depletion could only be allowed as to the four leases mentioned—Neal, Alexander, Miller, and

Fuller. Since there is no showing that the other 10 leases were over any portion of an oil zone, petitioners have not established any economic interest in the so-called common pool by virtue of their investment in those leases.

Even as to the four leases which have been shown to overlie the productive oil zone of the field, we cannot uphold petitioners' claims. The oil production which gave rise to the income was from neighboring properties and not from oil in place beneath the leases in which petitioners had a capital investment. In *Estate of H. W. Donnell, supra,* only one multiwell lease was involved, and although four slanted wells produced from beneath other properties, seven nondeviated wells on the lease produced oil in the years before the Court. Thus the lease obviously overlay the oil zone of the East Texas field but depletion was nonetheless denied as to the oil production from the four wells not bottomed under the lease. Whatever "economic interest" petitioners may have had in oil in place beneath their own leases we must conclude that they had no interest whatever in oil in place beneath their neighbors' leases even though portions of their own leases may have been over the producing Woodbine sand oil zone. What we have heretofore said with respect to the lack of any legal relationship between the income derived from the sale of oil from neighboring properties applies even if oil could or might have been produced legally by straight wells on petitioners' leases. Petitioners' arguments that they are entitled to depletion deductions on illegally produced oil from deviated wells because they might have been able to produce it legally, if their wells were in fact straight, are unconvincing. *Estate of H. W. Donnell, supra,* dictates a contrary conclusion.

Petitioners properly maintain that "economic interest" is not a concept grounded in the technicalities of property law. However, we are not persuaded by petitioners' further argument that if any portion of their properties overlie oil, any oil produced is from the economic interest of the taxpayer in the oil in place, "or the reservoir," as the same oil will be produced "wherever the bottom of the straw is located."

Recent Supreme Court statements of the classic test of economic interest have made little of the words "legal relationship," because the existence of at least some relationship between the taxpayer and the mineral income through which he secured a return of his capital has not often before been in issue.[7] See, e.g., the explanation of the classic

---

[7] In at least one other reported case, the Commissioner's disallowance of the depletion deduction was based upon his determination that the oil production had been from wells bottomed outside petitioners' property. However, the merits of petitioners' argument in the present case and the question of the necessity for a legal relationship were never reached. The trial court decided that the Commissioner had insufficient factual basis for his determination, and in effect that the burden was not upon the taxpayer for that reason. See *In re Sentinel Oil Co.,* 27 F. Supp. 304 (D. Cal. 1939), reversed without discussion of this point 109 F. 2d 854 (C.A. 9, 1940). Here we have found that the determinations were reasonably made and in no way arbitrary.

test as it is found in *Southwest Exploration Co.* v. *Commissioner*, 350 U.S. 308 (1956). Here the Supreme Court in discussing the second element of the test said merely: "The second factor has been interpreted to mean that the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital * * * " *Id.* at 314. Nonetheless, the words "legal relationship" were not omitted in *Southwest's* version of the test and have never been omitted in any authoritative formulation of the concept since *Palmer.* We must conclude that even if petitioners' leases did in part overlie producing oil sand of the East Texas field, the petitioners here bore no legal relationship to the oil which they produced through wells bottomed under their neighbors' property. For this reason, as well as for others to be discussed, *infra*, we conclude that even with the common pool approach applied petitioners had no economic interest in the oil which they illegally extracted.

We do not mean to suggest that the words "legal relationship" were originally meant to advert by inference to a situation such as the one presently confronting us, where minerals were extracted by illegal means.[8] However, legal relationship, at least means an arrangement countenanced by our legal order, a jural or contractual right to share in the proceeds of production. Petitioners' extraction of oil from one of the slanted wells in question, far from being countenanced by our legal order, has been specifically condemned in a civil judgment for illegal conversion of their neighbors' oil. *Harrington* v. *Texaco, Inc.*, 339 F. 2d 814 (C.A. 5, 1964). On the facts disclosed by this record their other production here involved was similar in nature. No legal arrangement permitted the petitioners to realize the income from their deviated wells. This income was secured by no jural right whatever, and, in fact, the income from the production was actually realized by acts which were illegal or extralegal. Not only would the owners of the neighboring properties have rights of action for conversion, but the Texas Railroad Commission would step in, as it did, to halt such illegal production. See *Elliff* v. *Texon Drilling Co.*, 210 S.W. 2d 558 (Tex. 1948).

Petitioners urge that because of the "common pool," they have suffered economic loss by the slant-well extraction even though it was from beneath others' leases. This argument has recently been rejected in *Tidewater Oil Co.* v. *United States*, 339 F. 2d 633 (Ct. Cl. 1964).

In *Tidewater*, certain oil producers in the East Texas field were given permission by the Railroad Commission to close their wells and transfer production to other wells in the field or to sell the right to

---

[8] Petitioners' acts amount to the tort of conversion. See *Harrington* v. *Texaco, Inc.*, 339 F. 2d 814 (C.A. 5, 1964), in which Texaco's unlawful conversion judgment against petitioners was upheld by the Court of Appeals for the Fifth Circuit. The deviated oil well there involved was the single well located upon the T & P Coal & Oil Co. lease here involved.

produce (the so-called allowable) to other operators. Tidewater Oil Co., the taxpayer in the cited case, was one of the transferees of these allowables, paying a consideration to the transferor for the transferred right to produce. Under the typical assignment, the taxpayer agreed to pay assignor a stated price per barrel, which varied with the posted sales price, for every barrel of the transferred allowable which the taxpayer-transferee produced. The issue in taxpayer's refund suit was whether or not the transferee-taxpayer had the sole economic interest in the oil produced from underneath its wells by virtue of the transferred allowables. The Government argued that the transferors had the requisite economic interest in the extra oil produced by virtue of the transferred allowables, and that the transferors could accordingly take the depletion allowance on the amounts paid to them by Tidewater, just as if the payments were royalties. However, the Court of Claims decided that Tidewater had the sole economic interest in the production from oil in place underneath its properties. Therefore, the transferee of the allowables (Tidewater) was allowed to include in gross income, for purposes of computing the depletion allowance, the entire amount paid by it to the transferors, and to take the entire depletion allowance.

The reasons advanced by the Government in support of its contention favoring the transferors were twofold. Firstly, they argued that the transferors had an investment in the entire common pool of oil (the field). This argument is virtually identical to that of petitioner in the present case. Secondly, the Government urged that the transferors came within the *Southwest Exploration* doctrine, and had made an indispensable contribution to the drilling for or extraction of oil. The Government argued that the transferred allowables were the sine qua non of the "excess" production. Both arguments were rejected by the Court of Claims. The rejection of the "indispensable contribution" argument does not concern us directly, but the rejection of the common pool approach bears directly upon our disposition of the present case. The Government in *Tidewater*, much like petitioner here, was unable to adduce persuasive evidence showing that the investment of the transferors had diminished by depletion as extra amounts of oil were produced through the transferee's wells. The court said:

there is nothing in the record before us which shows that these closed wells were *in fact* depleted. * * * All we know is that the oil which was being extracted came from taxpayer's wells, and since none was produced from the transferors' closed wells, there is a fair presumption that whatever oil was under their lease when the allowable was transferred would still be there when the allowable expired. [339 F. 2d at 636.]

Adopting the rationale of the *Tidewater* case to the analogous situation presented here, the petitioners have failed to establish that the oil lying beneath their leases, wherever located and if any, has been in

962

fact depleted. The oil which was being extracted by these petitioners had been *in place* beneath neighboring oil properties, and since none was produced from deposits beneath petitioners' leases, there is a fair presumption that whatever oil was under petitioners' leases prior to the illegal production would still be there after the illegal production had ceased. Certainly petitioners have failed to establish any diminution of whatever oil may have underlain their leases by their extractions through their slanted wells. Also, as previously indicated, petitioners here have not established an indispensable contribution to the drilling for or extraction of oil from beneath their neighbors' properties to bring them within the doctrine of *Southwest Exploration Co.* v. *Commissioner, supra.* See *CBN Corporation* v. *United States,* 364 F. 2d 393 (Ct. Cl. 1966).

Petitioners advance the rather frivolous additional argument that because income from the oil sold was taxable to them, they should be allowed the depletion deduction. To support the position, they cite *Anderson* v. *Helvering,* 310 U.S. 404 (1940), quite out of context. *Anderson* v. *Helvering* stands for the proposition that where an economic interest exists, income resulting from that interest is both taxable and subject to depletion. The income from oil converted and sold by petitioners is not taxable to them because of any economic interest they have therein. Petitioners' wrongful taking would not have the effect of creating an economic interest where one did not already exist and their reliance on *Anderson* is misplaced. See our discussion in *Estate of H. W. Donnell, supra* at 564.

We have carefully considered all of the suggestions, arguments, and contentions advanced by petitioners. Under no view of the law can petitioners be said to have had the economic interest required for depletion allowances in the illegally extracted oil which lay beneath adjacent properties. They simply had no investment subject to loss through depletion in that oil which the tax law would deem to have been "in place" within the limits of some other person's property. They have not established that they have suffered any economic loss by their production of their neighbors' oil nor have they made an indispensable or essential contribution to the development or legitimate extraction of that oil, so as to acquire an investment under the *Southwest Exploration* doctrine.

Our conclusion with respect to the allowance of depletion deductions also disposes of the sole issue remaining with respect to the amount of the net operating loss carryback for 1959 from 1962. The respondent's determination disallowing $3,831.77 of the $22,003.32 carryback claimed, all of which is depletion for the slanted wells, is sustained, so that the carryback of $18,171.55 conceded by respondent will be allowed.

*Decision will be entered under Rule 50.*